[Civ. No. 45640. Second Dist., Div. Two. Nov. 25. 1975.]

MAPO, INC., Plaintiff and Respondent, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

246

**COUNSEL**

Evelle J. Younger, Attorney General, Ernest P. Goodman, Assistant Attorney General, Philip C. Griffin and Herbert A. Levin, Deputy Attorneys General, for Defendant and Appellant.

Hill, Farrer & Burrill, Carl A. Stutsman, Jr., and Jack R. White for Plaintiff and Respondent.

## OPINION

FLEMING, Acting P. J.—The State Board of Equalization (Board) appeals the judgment in consolidated cases ordering the refund of $213,979.80, plus interest, for sales taxes and interest paid by respondent Mapo, Inc. (Mapo) on transactions from 1965 to 1971 with its corporate grandparent, Walt Disney Productions (Productions). The dispositive issue is whether those transactions constituted "sales" within the meaning of Revenue and Taxation Code section 6006, subdivision (b): " 'Sale' means and includes: . . . (b) The producing, fabricating, processing, printing, or imprinting of tangible personal property for a consideration for consumers who furnish either directly or indirectly the materials used in the producing, fabricating, processing, printing, or imprinting."

The trial court found that from July 1965 to July 1971 Mapo was a corporation wholly owned by WED Enterprises, Inc. (WED), which in turn was wholly owned by Productions. Mapo's sole function was to fabricate entertainment devices, chiefly animated mechanical figures, for use at Productions' amusement parks, including Disneyland and Walt Disney World. Up to 1965 Productions fabricated these entertainment devices at its motion picture studio machine shop, but multi-union jurisdictional problems involving diverse motion picture unions and guilds led to the formation of Mapo, by means of which the same fabrication work could be carried out by the same employees under one vertical union agreement. Subsequent to its corporate dissolution in 1971, Mapo continued its same work as a division of Productions.

Roger Broggie, a longtime Productions employee and head of its machine shop, ran Mapo operations throughout. He hired and fired Mapo personnel and supervised its day-to-day operations through subordinate supervisors at Mapo. Mapo's corporate parent, WED, designed the devices built by Mapo, and its personnel consisted of nonunion architects and engineers who enjoyed a profit-sharing plan. Broggie was carried on WED's payroll in order that he could enjoy the benefits of its profit-sharing plan. WED and Mapo occupied adjacent buildings in Glendale a few miles from Productions' studio in Burbank, their personnel worked closely on design and construction, but they undertook no project without the approval of the executive committee and board of directors of Productions. The officers of Mapo were on WED's payroll; its corporate directors were paid by WED and Productions.

Mapo's services were performed exclusively for Productions (and Retlaw Enterprises, a Disney-owned corporation which operated two attractions at Disneyland) in strict accordance with the terms of its written agreement with Productions. Under that agreement Productions furnished Mapo with all materials used in the fabrication of the entertainment devices, and Productions retained title to all ideas, materials, and completed devices. Productions paid Mapo at the rate of two times Mapo's direct cost of labor. Mapo's payroll, purchasing and accounting functions, and insurance coverage were taken care of by Productions and WED. Mapo's sole bank account was used only 'for payroll. All other transactions were handled as bookkeeping entries with Productions. Mapo did not warranty its work, and all risks of defects were assumed by Productions.

The trial court concluded the transactions between Mapo and Productions were not subject to sales tax because Productions was fabricating items for itself, and. because it directed, employed, and controlled the Mapo personnel who were doing the work. Mapo's sole function was that of paymaster. The court ruled that transactions between employees in fact and their employer are not sales within the meaning of section 6006, subdivision (b).

The Board contends the transactions were taxable because Mapo and Productions were separate corporations. The Board cites the general rule that courts should not disregard separate legal entities merely to grant relief from taxation, even when one corporation wholly owns the other and the corporations share corporate directors and officers. (*N. W. Pac. R. R.* v. *St. Bd. of Equalization,* 21 Cal.2d 524, 530 [133 P.2d 400]; *Rexall Drug Co.* v. *Peterson,* 113 Cal.App.2d 528, 530 [248 P.2d 433].) ▐ But application of the general rule depends on the facts of the particular case, such as the length of time the corporations separately exist (*Superior Coal Co.* v. *Department of Finance* (1941) 377 Ill. 282 [36 N.E.2d 354, 360]), the maintenance of distinct corporate identities (*In re Bush Terminal Co.* (2d Cir. 1938) 93 F.2d 661, 663), the independent business purposes of the separate corporations (*Des Moines & Cent. Iowa Ry. Co.* v. *Iowa State Tax Comm.* (1962) 253 Iowa 994 [115 N.W.2d 178]), and the observance of usual formalities of purchase and sale between the corporations. (*Washington Sav-Mor Oil Co.* v. *Tax Commission* (1961) 58 Wn.2d 518 [364 P.2d 440, 442]; see Annot. 64 A.L.R.2d 769.) Where these foundational facts are missing, the general rule may not apply. Thus in *Valier Coal Company* v. *Department of Revenue* (1957) 11 Ill.2d 402 [143 N.E.2d 35, 39, 64 A.L.R.2d 763], the court refused to impose a retailer's

occupation tax upon a wholly owned subsidiary of a railroad company which was required to sell coal at cost only to the railroad company.

Mapo existed as a separate corporation in name only, for in its six years it did nothing for its own account or for anyone except its corporate relatives. It acted solely on orders from Productions. It owned no materials, kept no books, bore no liability for its operation, recorded no profits. Its sole reason for existence was to make the fabrication of animated mechanical figures possible by reaching agreements with a single labor union that would be vertical, i.e., any person could work on any job and be classified and paid accordingly. Mapo appeared, simplified these union negotiations, acted as conduit for payment of salaries for certain Productions personnel, and disappeared without noticeable effect. ■ The temporary, paperwork transactions which resulted from its existence did not justify the imposition of sales taxes intended for dealings between separate producers and consumers.

Productions acts in good faith with the Board, and before implementing the Mapo project it obtained a favorable sales tax ruling from the Board's tax counsel. The Board now contends Productions did not satisfy the provision of the tax ruling which required Productions to exercise day-to-day control over Mapo operations. The Board stresses the fact that WED personnel directed much of Mapo's activities and Mapo craftsmen exercised discretion in implementing the basic designs prepared by WED. We think the Board ignores substance for form. The evidence shows, and the trial court found, that Roger Broggie of WED ran the day-to-day operations of Mapo, even to the details of individual work, as agent for Productions, that Productions controlled all operations of WED, and that WED and Mapo carried out no projects without approval from Productions. Productions thus fully complied with the spirit of the Board's contemporaneous interpretation of section 6006, an interpretation which we are entitled to weigh in construing the statute. (*Coca-Cola Co.* v. *State Bd. of Equalization*, 25 Cal.2d 918, 921 [156 P.2d 1].)

We conclude that Productions was fabricating items for itself through its employees in fact, and therefore no sales tax was payable.

The judgment is affirmed.

Compton, J., and Beach, J., concurred.

A petition for a rehearing was denied December 17, 1975, and appellant's petition for a hearing by the Supreme Court was denied January 21, 1976.