[S.F. No. 23563. Mar. 23, 1977.]

WESTERN STATES BANKCARD ASSOCIATION,
Plaintiff and Respondent, v.
CITY AND COUNTY OF SAN FRANCISCO et al.,
Defendants and Appellants.

## COUNSEL

Thomas M. O'Connor, City Attorney, and John J. Doherty, Deputy City Attorney, for Defendants and Appellants.

Morrison & Foerster, Franklin C. Latcham, Prentiss Willson, Jr., and Laura Stern for Plaintiff and Respondent.

## OPINION

**RICHARDSON, J.**—This is an action for declaratory relief and for the recovery of gross receipts and payroll expense taxes which were assessed against plaintiff Western States Bankcard Association (WSBA) by the City and County of San Francisco and paid under protest for the years 1970 through 1972. The issue is whether WSBA, a nonstock, nonprofit California corporation formed by various state and national banks to administer the Mastercharge credit card system, is entitled to the benefit of constitutional and statutory provisions which grant to "banks" an "in lieu" exemption from local personal property and privilege taxes. (Cal. Const., art. XIII, § 27 (former § 16); Rev. & Tax. Code, §§ 23181, 23182.)

WSBA claims its operations are so closely intertwined with those of its member banks located in California that subjecting it to municipal payroll or gross receipts tax amounts to impermissible local taxation of the member banks. Alternatively, it argues that a nonprofit organization which is wholly owned by banks and which performs traditional banking functions exclusively for banks is entitled to the same in lieu exemption that is available to banks.

The questions presented are those of first impression. We will conclude that the incidence of San Francisco's gross receipts and payroll expense taxes falls upon an independent entity, WSBA, rather than upon its member banks, and that the relationship between WSBA and its members is not such as to justify disregarding its corporate status for tax purposes.

The case was submitted to the trial court on stipulated facts which we summarize. WSBA, a California corporation headquartered in San Francisco, was organized by independent national and state banks to administer their Mastercharge accounts. The Mastercharge cards are issued by individual banks which compete among themselves for card customers. WSBA acts as a clearinghouse, performing data processing and promotional functions for all member banks. It neither issues cards nor extends credit. The system is intended to afford smaller banks a realistic, economically feasible means of competing with its principal competitor BankAmericard.

Basically, the credit card network administered by WSBA involves four parties: (1) the cardholder bank, which has issued a Mastercharge card (and thereby extended a line of credit) to a customer; (2) the cardholding customer; (3) the retailer who has accepted Mastercharge cards; and (4) the merchant bank that has agreed to purchase Mastercharge transaction slips from the retailer. Routinely, the customer makes a credit card purchase from the retailer, who deposits the transaction slip in his account with the merchant bank. The merchant bank credits the retailer's account with the cash value of the transaction less a stated discount, and sends the slip to WSBA along with a processing fee. WSBA retains the processing fee, credits the merchant bank's account, debits the cardholder bank's account, and forwards the slip to the cardholder bank which, in turn, bills the customer. At regular intervals WSBA also collects from the merchant bank and credits to the cardholder bank a "cost of money factor" intended to compensate the latter for use of its money during the period between the transaction date and the date the customer's payment is due. Each bank involved in the system must be either a member of WSBA, or a member of one of the regional bankcard associations with which WSBA has a cooperative agreement.

WSBA is managed by 13 elected directors, all but one of whom must be an officer of a member bank. It hires its own employees, and purchases or leases equipment necessary to perform its functions; in

dealing with third parties, it acts in its own name and for its own account. Moreover, as an independent corporation it is entitled to benefits not available to banks, such as the right to hold and deal with real property, free of the restrictions imposed upon the banks themselves. (See Fin. Code, §§ 750-753.)

WSBA has "interchange" agreements with a network of similarly organized bankcard associations throughout the nation, and the fees it charges member and nonmember banks for its processing and promotional services are its only source of revenue. The bulk of its income, approximately 90 percent, is derived from clearing services performed for member banks located in California. Because it was intended to operate on a nonprofit basis, WSBA's operating rules provide for periodic adjustment of its fee structure to equalize income and expenditures. The equalization effort has been successful for the most part, although rapid growth of the Mastercharge system did result in unexpectedly large revenues and small net operating profits for the fiscal years 1971 through 1973.

In 1968 and 1970, respectively, the Board of Supervisors of the City and County of San Francisco enacted a "business tax" ordinance (gross receipts tax) and a "payroll expense tax" ordinance applicable to persons engaging in business activities in San Francisco. The taxes are alternative, the taxpayer being liable under that ordinance which results in the higher tax liability for any given year. Both ordinances, however, expressly exempt any business which the city is prohibited from taxing under the federal or state Constitutions. WSBA claims to be such a business.

Article XIII, section 27, of the California Constitution provides that the Legislature shall levy a tax on the net income of state and national banks which "shall be in lieu of all other taxes and license fees upon banks or their shares, except taxes upon real property and vehicle registration and license fees." To implement the constitutional directive while maintaining approximate tax parity between exempt and nonexempt institutions, the Revenue and Taxation Code distinguishes among three types of taxable corporations: general corporations, banks, and financial institutions other than banks, each of the three being subject to a different tax scheme. At the times pertinent herein, section 23151 provided for a general corporate franchise tax of 7 percent measured on net income. The tax rate for banks and financial corporations was 11 percent. (Rev. & Tax. Code, § 23186.) In conformity with the constitu-

tional provision cited above, the 11 percent tax on bank income was *in lieu of* all other state and local personal property and privilege taxes. General corporations and financial institutions *other than banks,* however, are not exempt from local taxation. Thus, in the years at issue, general corporations paid a 7 percent franchise tax, plus local excise and license fees; banks paid an 11 percent tax on net income, but no local taxes; and financial corporations paid the 11 percent income tax *and* all applicable local taxes, but set off the total local taxes paid against their state franchise tax liability. (Rev. & Tax. Code, § 23184.)

WSBA's member banks located in California all paid and continue to pay the higher in lieu tax. Unquestionably, they were, and are, exempt from most local taxation, including the gross receipts and payroll expense taxes at issue herein. To date, WSBA itself has been treated as a general corporation, paying taxes during its profit-making years at the lower general franchise rate. (Rev. & Tax. Code, § 23151.) It now contends that it is entitled to in lieu treatment with respect to the municipal taxes sought to be imposed by the City of San Francisco.

The trial court found that although WSBA is not a bank, the constitutional exemption created by imposition of the in lieu tax on its member banks extends beyond the banks themselves to encompass WSBA, the independent legal entity which administers the members' cooperative credit card system. Consequently, the court held exempt from municipal taxation that portion of WSBA's gross receipts or payroll expense generated by California banks paying the in lieu tax.

Since all of the pertinent facts were stipulated and the sole question presented to the trial court was the applicability of the statutes to those facts, the issue essentially is one of law for de novo determination by the appellate court. (See *City of Los Angeles* v. *Security Systems, Inc.* (1975) 46 Cal.App.3d 950, 952-953 [120 Cal.Rptr. 600]; *Bank of America* v. *State Bd. of Equal.* (1962) 209 Cal.App.2d 780, 793 [26 Cal.Rptr. 348]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 256, pp. 4247-4248.) We conclude that the determination of the trial court is in error and that its judgment must be reversed.

I. *The "Banking Functions" Theory*

█ We consider first the less convincing of WSBA's two arguments: that nonprofit organizations performing "traditional banking functions"

exclusively for banks may themselves obtain in lieu benefits even though they are not and do not purport to be banks. In support of this proposition WSBA cites numerous cases interpreting constitutional and statutory "welfare" and "educational purposes" property tax exemption provisions. For the most part, these cases conclude that property used for activities incidental to, and reasonably necessary for, the accomplishment of a religious, charitable or educational purpose is entitled to the appropriate exemption. (*Cedars of Lebanon Hosp.* v. *County of L. A.* (1950) 35 Cal.2d 729 [221 P.2d 31, 15 A.L.R.2d 1045] [student nurses' residence; staff recreational facilities]; *Y. M. C. A.* v. *County of L. A.* (1950) 35 Cal.2d 760 [221 P.2d 47] [rental dormitory]; *House of Rest* v. *County of Los Angeles* (1957) 151 Cal.App.2d 523 [312 P.2d 392] [living accommodations for furloughed missionaries]; *Squire* v. *Students Book Corp.* (9th Cir. 1951) 191 F.2d 1018 [bookstore owned by student association]; *Ass'n of Medical Colleges* v. *Lorenz* (1959) 17 Ill.2d 125 [160 N.E.2d 763] [facilities used by medical education service organization].) Accordingly, it is asserted that WSBA's activities are "traditional banking functions" incidental to and reasonably necessary for the conduct of a modern banking operation, and should therefore fall within the exemption available to banks. (Cal. Const., art. XIII, § 27 (former § 16); Rev. & Tax. Code, §§ 23181, 23182.)

Initially we note that the data processing and promotional services offered by WSBA are "banking functions" only in the sense that, in this particular instance, they are performed exclusively for banks. While credit cards may be simply a modern form of the conventional small personal loan and thus properly within the banking realm (see *Colorado Springs National Bank* v. *United States* (10th Cir. 1974) 505 F.2d 1185, 1190), it is undisputed that WSBA neither issues credit cards nor extends credit; it merely performs the kind of accounting and processing tasks incidental to banking and to many other types of business operations as well.

The essential defect in WSBA's argument, however, is that the various statutes which are construed in the cases cited create exemptions expressly contingent, in part, upon the *nature of the activity* in which the taxpayer is engaged. (See, e.g., Cal. Const., art. XIII, § 4, subd. (b), implemented by Rev. & Tax. Code, § 214 [exemption for property owned by nonprofit organizations and "used exclusively for religious, hospital, . . . or charitable purposes . . ."]; Int. Rev. Code, § 501(c)(3) (former § 101(6)) [federal income tax exemption for corporations "organized and operated exclusively for religious, charitable, . . . or

educational purposes . . ."]; Ill. Rev. Stat. 1957, ch. 120, ¶ 500 [property tax exemption for facilities "used for . . . public educational purposes"].) The organizations seeking exemption in the cited cases met threshold statutory criteria: they were nonprofit entities, organized and operated to further religious or public service purposes. The sole issue was whether they complied with the *additional* requirement that activities conducted on the allegedly exempt premises be within the scope of the religious or charitable purpose.

The California in lieu tax exemption provisions, on the other hand, apply by their terms only to "banks," and not to nonprofit institutions organized and operated for banking purposes. (Cal. Const., art. XIII, former § 16, subd. (1)(a) ["banks, including national banking associations"]; Rev. & Tax. Code, §§ 23181 ["every bank located within the limits of this state"], 23182 ["banks"].) The first and essential prerequisite for the exemption in the matter before us is that the organization claiming exemption be a *bank*. It is only after that initial requirement has been met that the particular nature of its activities becomes an issue, if at all.

Further, the objectives underlying the welfare exemption, on the one hand, and the in lieu exemption for banks, on the other, are fundamentally different. By providing a tax exemption on property used for religious or public service purposes the Legislature clearly indicated its intent to encourage nonprofit activities inuring to the public benefit. The courts quite properly have sought to implement this aim by construing the statutory and constitutional provisions so that the exemption is available not only for facilities essential to achievement of public service oriented purposes, but also for those facilities "incidental to and reasonably necessary" for their accomplishment. (See *House of Rest* v. *County of Los Angeles, supra,* 151 Cal.App.2d 523, at pp. 532-533; *Ass'n of Medical Colleges* v. *Lorenz, supra,* 17 Ill.2d 125; but compare *Y. M. C. A.* v. *County of L. A., supra,* 35 Cal.2d 760, at pp. 774-775.)

California's in lieu tax scheme, in contrast, was designed not to promote the banking business but primarily to make possible state taxation of national banks. Until 1973, section 548 (U.S. Rev. Stat., § 5219 (1926), 42 Stat. 1499, 44 Stat. 223) imposed severe restrictions on state taxation of national banking associations. Basically, states were allowed to levy one of several specified taxes, in lieu of all others, and the tax so levied could not exceed that imposed upon state financial corporations. To achieve tax-rate parity between national and state

banking institutions, a prerequisite for *any* tax upon national banks, California adopted the federally designated in lieu tax on net income and made it applicable to all banks located within the state. (Cal. Const., art. XIII, § 27 (former § 16); Stats. 1929, ch. 13, §§ 1, 3, p. 19 (now Rev. & Tax. Code, §§ 23181, 23182); see Traynor & Keesling, *Recent Changes in the Bank and Corporation Franchise Tax Act* (1933) 21 Cal.L.Rev. 543, 543-544.) The end result was that competing state and national institutions received the same benefits and paid taxes at the same rate. In 1962, when the restrictive federal legislation was still operative, Congress authorized the creation of "banking service organizations" to perform for national banks the same kinds of support activities in which WSBA is engaged. (76 Stat. 1132, 12 U.S.C.A. § 1861(b), (c).) We believe it is significant that Congress did not, however, provide banking service organizations with the same protection from state taxation afforded to banks themselves. (See 12 U.S.C.A. § 1861 et seq.; U.S. Rev. Stat., § 5219 (1926), 42 Stat. 1499, 44 Stat. 223.) As the federal government found it neither necessary nor advisable to treat bank service organizations in the same manner as banks, no convincing reason appears for extending to WSBA, an institution similar to bank service organizations, the benefits of state legislation originally designed to accord with and implement the federal scheme.

Thus, even assuming that the usual rule requiring strict construction of tax exemption provisions does not govern the interpretation of an in lieu scheme (see *San Francisco* v. *Pacific Tel. & Tel. Co.* (1913) 166 Cal. 244, 248-249 [135 P. 971]), there is no discernible policy basis for a "liberal" interpretation extending exemption benefits to nonbanks. We conclude, accordingly, that WSBA is not in its own right entitled to in lieu immunity from San Francisco's gross receipts and payroll expense taxes.

II. *Incidence of the Taxes*

█ Plaintiff's second and more persuasive argument is that imposition of the municipal payroll or gross receipts tax would result, by reason of WSBA's peculiarly close connection with its members, in local taxation of the member banks themselves. Although some revenue is derived from nonmember banks and from member banks not located in California, the source of 90 percent of WSBA's income is the fees charged California member banks, all of which pay the in lieu tax. Those banks are constitutionally and statutorily entitled to exemption from the kind of local taxes under examination. If the San Francisco payroll expense and gross receipts taxes operate as direct local taxes upon

California banks, they are clearly prohibited. (Cal. Const., art. XIII, § 27 (former § 16); Rev. & Tax. Code, §§ 23181, 23182; *Hughes* v. *Los Angeles* (1914) 168 Cal. 764 [145 P. 94].)

In this connection, it will be recalled that WSBA legally is an independent corporation organized under the laws of California. As such, it acts, and has always acted, in its own name and on its own behalf. The gross receipts and payroll expense taxes at issue herein were and are assessed against WSBA, not against its member banks. Nonetheless, it is difficult to determine who in the chain of commercial transactions actually bears the burden of a particular tax. It is true that "[t]he person liable for the tax, primarily, cannot always be said to be the real taxpayer." (*Colorado Bank* v. *Bedford* (1940) 310 U.S. 41, 52 [84 L.Ed. 1067, 1074, 60 S.Ct. 800]; cf. *Bank of America* v. *State Bd. of Equal.* (1962) 209 Cal.App.2d 780 [26 Cal.Rptr. 348].) Indeed, the United States Supreme Court has held that, at least for purposes of federal tax immunity, a statutory provision requiring that the tax be passed on in toto to another party will shift the incidence as a matter of law from the first party to the second, even if it is the former who is answerable to the taxing entity. (*United States* v. *Mississippi Tax Comm'n* (1975) 421 U.S. 599, 607-608 [44 L.Ed.2d 404, 412-413, 95 S.Ct. 1872]; *Agricultural Bank* v. *Tax Comm'n.* (1968) 392 U.S. 339, 347-348 [20 L.Ed.2d 1138, 1143-1144, 88 S.Ct. 2173]; *Colorado Bank* v. *Bedford, supra,* at pp. 44-51 [84 L.Ed. at pp. 1069-1073].)

The San Francisco tax ordinances before us contain no mandatory pass-on provisions, and it is equally clear that the mere ability to recoup the loss by raising prices will not necessarily shift the legal incidence of the tax. (*Gurley* v. *Rhoden* (1975) 421 U.S. 200, 204 [44 L.Ed.2d 110, 115, 95 S.Ct. 1605]; *Western L. Co.* v. *State Bd. of Equalization* (1938) 11 Cal.2d 156, 162-163 [78 P.2d 731, 117 A.L.R. 838]; *Diamond Nat. Corp.* v. *State Bd. of Equalization* (1975) 49 Cal.App.3d 778 [123 Cal.Rptr. 160], revd. on the issue of fed. immunity, 425 U.S. 268 [47 L.Ed.2d 780, 96 S.Ct. 1530].)

As we have noted, WSBA's articles of incorporation and operating rules require that income and expenditures be equalized. Accordingly, the immediate effect of imposing the applicable municipal tax on WSBA is to cause the association either to raise its processing fees or, as is more likely, to lower them less than would otherwise be permitted by the increased revenue attendant upon steadily growing volume. On its face this process is essentially what occurs in most taxing situations: the onus

is passed down the commercial chain, link by link, until it is diffused in the pool of ultimate consumers.

The difference, WSBA asserts, is its connection with its tax-exempt member banks: WSBA performs services only for banks or regional associations of banks, its income is derived primarily from tax-exempt banks, and its potential profits are channeled back to the banks via periodic reductions in processing fees. In effect, member banks are "dealing with themselves," it is asserted, through the insubstantial (for tax purposes) intermediary of WSBA.

In *Hughes* v. *Los Angeles, supra,* 168 Cal. 764, we examined similar constitutional and statutory considerations in dealing with the taxation of insurance companies. Article XIII, section 14-4/5, of the California Constitution (now art. XIII, § 28; see also Rev. & Tax. Code, § 12204) provided for an *in lieu gross premiums tax applicable to most insurers.* The City of Los Angeles enacted an ordinance purporting to exact a license fee from local insurance agents and brokers. The city conceded that the fee could not be imposed upon the insurance companies themselves, but argued that agents and brokers could be subjected to such a revenue-raising "privilege tax." We held, with respect to *agents,* that although agents are not insurers, insurance corporations "must act through agents and can act only through agents, and . . . therefore, in a *direct and immediate sense* a tax upon . . . [the] agents . . . is a tax upon the corporation's right to do business." (*Id.,* at p. 765, italics added.) The same reasoning was applied later in *Groves* v. *City of Los Angeles* (1953) 40 Cal.2d 751 [256 P.2d 309], wherein we held that a bail bondsman acting for a California insurance company could not be compelled to pay a city gross premiums tax. The city argued that the bail bondsman, who deducted from the customer's premium his commission and operating expenses before forwarding the balance to the company, was an independent contractor rather than an agent. We concluded, however, that since insurers were prohibited by statute from engaging in the bail bond business except through state-licensed bondsmen, such bondsmen were essentially agents, whatever the "bookkeeping method" employed between the parties.

The independent contractor issue was raised again in a very recent case, *Marsh & McLennan of Cal.* v. *City of Los Angeles* (1976) 62 Cal.App.3d 108 [132 Cal.Rptr. 796]. There, the city assessed a gross receipts tax against an insurance *broker,* specifically exempting from taxation any funds he acquired as an agent. Acknowledging that neither agents nor brokers are covered by the express language of the exemption,

the Court of Appeal reiterated the *Hughes* rule that agents necessarily come within the scope of the exemption because a tax upon the agent through whom an insurer is compelled to act amounts to a direct tax upon the insurer himself. (*Id.,* at pp. 114, 116.) But, noting that the essential distinction between an agent and a broker is the former's power to bind his principal, the court rejected the argument that brokers and agents perform such similar functions that taxing one while relieving the other of local tax obligations is unreasonably discriminatory.

We believe the foregoing approach is correct and, as applied to the facts of the present case, dispositive. It is well established that corporate status will not be disregarded to facilitate tax avoidance. (*Mapo, Inc.* v. *State Bd. of Equalization* (1975) 53 Cal.App.3d 245, 248 [125 Cal.Rptr. 727]; *Rexall Drug Co.* v. *Peterson* (1952) 113 Cal.App.2d 528, 530 [248 P.2d 433]; 55 Ops.Cal.Atty.Gen. 20; see *Moline Properties* v. *Comm'r* (1943) 319 U.S. 436, 439 [87 L.Ed. 1499, 1502-1503, 63 S.Ct. 1132]; *Arizona State Tax Com'n* v. *First Bank Building Corp.* (1967) 5 Ariz.App. 594 [429 P.2d 481, 486].) WSBA's ties to its parent banks are indeed close and its activities severely restricted. Nonetheless, it remains, essentially, an independent subsidiary. Furthermore, while WSBA doubtless is an economically efficient entity, there exists no compulsion on its member banks to act through it in the manner characteristic of the *Hughes* and *Groves* cases. WSBA's member banks could have performed clearing chores in house—albeit, at some considerable cost. Alternatively, they could have contracted the business with third party commercial data processing firms. The latter would certainly have had no colorable claim, via their customer-banks, to any in lieu tax exemption. (See *Western L. Co.* v. *State Bd. of Equalization, supra,* 11 Cal.2d 156; *Diamond Nat. Corp.* v. *State Bd. of Equalization, supra,* 49 Cal.App.3d 778, revd. on the issue of fed. immunity, 425 U.S. 268.) The banks chose instead to create an independent organization. This they had a perfect right to do but, in our view, could not enfold this entity with the banks' own "in lieu" tax immunity.

We conclude that the incidence of the San Francisco payroll expense and gross receipts taxes is upon WSBA, not its exempt bank members. At most, the member banks are subjected to *indirect* taxation by payment of the higher processing fees that WSBA's nonexempt status will necessitate. While it is perhaps unfortunate that efficiency should entail a tax penalty, no real injustice in this particular case is evident. San Francisco's municipal tax ordinances do not single out bank-related businesses

or activities, but apply to all locally taxable businesses within the city. (*Marsh & McLennan of Cal.* v. *City of Los Angeles, supra,* 62 Cal.App.3d at p. 120; *Edward Brown & Sons* v. *McColgan* (1942) 53 Cal.App.2d 504, 510-511 [128 P.2d 186].) Having chosen WSBA's corporate form for its peculiar benefits, the member banks may fairly and reasonably be required to accept the tax burdens necessarily attendant upon that form.

The judgment is reversed.

Tobriner, Acting C. J., Mosk, J., Clark, J., Sullivan, J.,* and Elkington, J.,† concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†Assigned by the Chairman of the Judicial Council.