GREEN CONSTRUCTION COMPANY, Reading & Bates Construction Company, Select Construction Company, Inc., and Midwest Green Inc., Appellants,

v.

STATE of Alaska, DEPARTMENT OF REVENUE, Appellee.

No. 7022.

Supreme Court of Alaska.

Sept. 30, 1983.

Michael T. Thomas, Robertson, Monagle, Eastaugh & Bradley, Anchorage, and Arthur D. McGarry, Oles, Morrison, Rinker, Stanislaw & Ashbaugh, Seattle, Wash., for appellants.

Barbara Herman, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BURKE, C.J., RABINOWITZ and MATTHEWS, JJ., and CRANSTON, Superior Court Judge.[*]

OPINION

RABINOWITZ, Justice.

This appeal challenges the Department of Revenue's decision to assess additional taxes against the appellants under the Alaska Business License Act (ABLA) for the years 1972 through 1977.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Each taxpayer had entered into a contract with Alyeska Pipeline Service Company ("Alyeska") to supply materials to and assist Alyeska in the construction of the Trans-Alaska Pipeline System.[1] In accordance with their individual contracts, between 1972 and 1977 Alyeska paid the taxpayers a "total CONTRACT PRICE ... consisting of the sum of REIMBURSABLE COSTS, FIXED COSTS and FIXED FEE[S]." The taxpayers reported the sums they received from Alyeska for fixed costs and fixed fees as taxable gross receipts under the ABLA in their annual returns. They did not, however, report their reimbursable costs as taxable gross receipts. Green-Associated also did not report the proceeds from its sale of construction equipment in 1976 and 1977 as taxable gross receipts.

The ABLA imposes a tax on gross receipts, that is, on all money, credits or other consideration received, and does not permit any deduction for money paid to cover expenses. AS 43.70.030 (amended 1978).[2] The Audit Division of the Department of Revenue (Division) determined that the taxpayers should have included their reimbursable costs as gross receipts in their returns. The Division also decided that Green-Associated should have included in its return the proceeds from its sale of equipment as gross receipts. Accordingly, on December 28, 1978, the Division assessed approximately an additional one million dollars in taxes, plus interest, against the taxpayers.

The Department of Revenue (Department) thereafter held a formal hearing on the assessments at the request of the taxpayers. The taxpayers presented three arguments against being assessed the additional taxes: first, they argued that the assessments for the 1973 and 1974 tax years were barred by the applicable three-year statute of limitations (AS 43.05.260); second, they contended that the reimbursable costs received from Alyeska did not

---

[1] The appellants in this action are the following joint ventures: the joint venture formed between Green Construction Co. and Associated Pipeline Contractors, Inc. ("Green-Associated"); the joint venture formed between Associated Pipeline Contractors, Inc. and Green Construction Co. ("Associated-Green"); and the joint venture formed between Select Construction Co., Associated Pipeline Contractors, Inc., and Green Construction Co. ("Select-Associated-Green") (collectively referred to as "the taxpayers").

[2] Former AS 43.70.030 provides, in relevant part:

(a) The license fee for each business is $25 plus a sum equal to one-half of one percent of the gross receipts in excess of $20,000 from the business during the year for which the license is issued. . . .

"Gross receipts" is defined in AS 43.70.110(2), set out infra at n. 3. The "percentage of gross receipts" tax of the ABLA was repealed in 1978. 1978 Alaska Sess. Laws chap. 144, § 3. For clarity, the former version of the ABLA will be referred to in the present tense.

constitute taxable gross receipts under the Alaska Business License Act (ABLA); and third, Green-Associated took the position that the proceeds from its sale of equipment to Alyeska did not constitute taxable gross receipts because the sales were isolated events and not part of its "business" as defined by the ABLA. The Department rejected each of these arguments and upheld the Audit Division's assessments.

The taxpayers paid the assessments under protest and appealed the Department's decision to the superior court, raising these same arguments. The superior court rejected these arguments and affirmed the Department's decision. This appeal followed.

## II. STATUTE OF LIMITATIONS

The taxpayers' first argument is that the Department's assessments for additional taxes for the 1973 and 1974 tax years are barred by the three-year statute of limitations set forth in AS 43.05.260(a). This statute provides as follows:

*Limitation on Assessment.* (a) Except as provided in AS 43.20.200(b), the amount of a tax imposed by this title must be assessed within three years after the return was filed, whether or not a return was filed on or after the date prescribed by law. If the tax is not assessed before the expiration of the three-year period, no proceedings may be instituted in court for the collection of the tax.

The taxpayers contend that the December 1978 assessments for the 1973 and 1974 tax years are invalid and barred by this statute because they were not made within three years of the date when the tax returns were filed.

■ AS 43.05.260(a) was not enacted until 1976. 1976 Alaska Sess. Laws chap. 94, § 1. The legislature specifically made the statute retroactive to January 1, 1976. 1976 Alaska Sess. Laws chap. 94, § 5. Applying the statute to bar assessments on returns filed prior to January 1, 1976, would

**3.** AS 43.70.110(2) provides as follows:

require a completely retroactive application of the statute, contrary to the express intent of the legislature. We considered and rejected this possibility in our recent opinion in *State v. Alaska Pulp America, Inc.*, 674 P.2d 268 (1983). For the reasons expressed therein, we affirm the Department's decision that AS 43.05.260(a) does not bar its 1978 assessments for additional taxes.

## III. REIMBURSABLE COSTS

Alyeska and the taxpayers established a special procedure for handling the taxpayers' "reimbursable costs." These included the costs of salaries and wages for field employees and staff, as well as the costs of equipment, materials purchased or rented by the taxpayers, taxes and duties imposed on the materials and equipment, construction plant, minor subcontracts, and transportation mobilization and demobilization. The taxpayers opened "zero balance bank accounts" to receive and disburse money for these items. When a taxpayer incurred a reimbursable cost, it would write a check on the account and notify Alyeska. Upon approval, when necessary, Alyeska would deposit that amount of money into the account from one of its own accounts. Alyeska's prior approval was only required for single payroll expenditures in excess of $2,000.00 and single general expenditures in excess of $50,000.00.

■ The taxpayers argue that these reimbursable costs were not taxable gross receipts because the taxpayers did not "receive" the money for the costs and because, if they did receive the money, it nonetheless did not constitute a "gross receipt" as defined by the ABLA. The Department rejected this argument and upheld the Audit Division's inclusion of the money as part of the taxpayers' gross receipts. The propriety of the taxpayers' contention that the Department's decision was erroneous turns upon an interpretation of AS 43.70.110(2), which defines "gross receipts".[3]

"Gross receipts" means receipts from sources in the state, whether in the form of

## A. *"Receipt" of money for reimbursable costs*

The taxpayers argue that they did not "receive" the money deposited into their bank accounts. They state that "[w]hile the zero balance bank accounts were in the names of the taxpayers, it is undisputed that they were for all practical purposes Alyeska accounts." In fact, this is not undisputed. The taxpayers continue, however, stating: "Alyeska determined the banks at which the accounts could be set up, Alyeska funds were used in the accounts, and Alyeska was the only entity to which the banks looked for reconciliation of overdrafts." Relying upon *Kansas City v. Luzier, Inc.,* 420 S.W.2d 63, 68 (Mo.App.1967), *Laclede Gas Co. v. City of St. Louis,* 253 S.W.2d 832, 837 (Mo.1953) (en banc), and an informal opinion of the Alaska Attorney General in 1954, the taxpayers assert that money cannot be included as a gross receipt of the taxpayer if the taxpayer exercises no dominion over it, that is, cannot spend it or borrow against it.

The Department correctly observes that this general rule of law simply is not applicable to the facts of this case. The zero balance bank accounts were opened in the names of the taxpayers. The taxpayers were the signators on the accounts and they controlled the account statements. Alyeska exercised no control over the accounts, just as the taxpayers had no control over the Alyeska accounts from which the funds were transferred. Furthermore, the taxpayers do not dispute the Department's assertion that if Alyeska refused to advance any particular cost, the creditor would look to the taxpayer, rather than Alyeska, for payment. Contrary to the taxpayers' contention, the funds passing through the zero balance bank accounts were not "amounts which Alyeska ... disbursed directly to third parties." The underlying arrangement remained one in which the taxpayers incurred certain obligations in the course of their business with Alyeska, for which Alyeska reimbursed them.

Our conclusion that the taxpayers received the money deposited into their accounts is in accordance with the decision of the United States Supreme Court in *United States v. New Mexico,* 455 U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982). In that case, the United States government had contracted with corporations to perform certain work for it. The contracts were almost identical to the taxpayers' contracts with Alyeska in this case. The property procured by the corporations, as well as their labor costs, were paid for in advance by the government through the use of a zero balance bank account. The government approved all purchases by the corporations and deposited money into their accounts for payment of the expense. The corporations asserted that this "advanced funding" did not constitute a gross receipt of the corporation's business. The Supreme Court summarily rejected this argument, concluding that there is no conceptual difference between the use of a zero balance bank account and traditional reimbursements, which are includable as gross receipts. It stated:

[T]he New Mexico gross receipts tax must be upheld as applied to funds received by [the corporations] to meet salaries and internal costs. Once it is conceded that [the corporations] are independent taxable entities, it cannot be disputed that their gross income is taxable.... [I]ncurring obligations to achieve contrac-

money, credits, or other valuable consideration received from engaging in or conducting a business without deducting the cost of the property sold, the cost of the materials used, labor or service cost, interest paid, taxes, losses, or any other expense.... "Gross receipts" also includes all amounts paid or assigned to subcontractors. Individuals representing firms taxed under this chapter on volume of business done, working as agents on commission instead of as employees, may

compute their gross receipts as equal to their gross commissions.

Although we must use our independent judgment in interpreting this statute, the Department's interpretation is nonetheless entitled to "some weight." *National Bank of Alaska v. State, Department of Revenue,* 642 P.2d 811, 815–16 (Alaska 1982); *Union Oil Co. of California v. Department of Revenue,* 560 P.2d 21, 25 (Alaska 1977).

tual ends is not significantly different from using property for the same purposes. And despite the Government's arguments, *the use of advanced funding does not change the analysis. That device is, at heart, an efficient method of reimbursing contractors*—something the Government has apparently recognized in contexts other than tax litigation. 455 U.S. at 741, 102 S.Ct. at 1386, 71 L.Ed.2d at 596 (emphasis added).[4] We accordingly reject the taxpayers' argument that it did not "receive" any money from Alyeska for its reimbursable costs, which would preclude including the sums as part of the taxpayers' gross receipts.

B. *Agency exception*

■ The taxpayers argue, alternatively, that even if they did receive the money deposited into their zero balance bank accounts, the money still is not includable as gross receipts of their businesses because the taxpayers fall within the "agency exception" to the requirement that all gross receipts be reported. AS 43.70.110(2) states in relevant part as follows: "Individuals representing firms taxed under this chapter on volume of business done, working as agents on commission instead of as employees, may compute their gross receipts as equal to their gross commissions." It is apparent that the taxpayers do not fall within this exception. In order to qualify, they would have to establish three facts: first, that Alyeska was taxed under the ABLA on the volume of business it did; second, that they were Alyeska's agents; and third, that they were paid "commissions," rather than salaries or some other measure of compensation. The taxpayers have not made any serious attempt to prove the first and third facts; instead, they focus exclusively on whether or not they were agents of Alyeska.

■ We agree with the Department that the taxpayers cannot prevail on even this narrow issue of agency relationship. The taxpayers have the burden of demonstrat-

ing that they were acting as Alyeska's agents. *Western Adjustment & Inspection Co. v. Gross Income Tax Division,* 236 Ind. 639, 142 N.E.2d 630, 635 (1957). They assert on appeal that "[t]he substance of the relationship between the taxpayers and Alyeska was one of agent and principal because of Alyeska's significant controls over acquisition of materials and labor and payment therefor with Alyeska funds."

■ These facts, without more, are not sufficient to establish an agency relationship. The Restatement (Second) of Agency § 1(1) (1958) defines "agency" as follows: "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." As indicated by the Department, the taxpayers have not provided any evidence that Alyeska manifested its consent to the taxpayers acting as its agents. The taxpayers also have not provided evidence to support their contention that Alyeska authorized the taxpayers to create contractual obligations with third parties that would be binding upon Alyeska. The contracts between the taxpayers and Alyeska specifically stated:

For the purpose of CONTRACT and all WORK to be provided hereunder, CONTRACTOR is, and shall be deemed to be, an independent contractor *and not the agent or employee* of OWNERS or ALYESKA. Neither ALYESKA nor OWNERS shall have the authority to supervise the employees or representatives of CONTRACTOR and accomplishing WORK shall be under the supervision and control of CONTRACTOR. CONTRACTOR shall have no authority to make any statements, representations or commitments of any kind, or to take any action, which shall be binding upon OWNERS or ALYESKA, except as provided herein or authorized by OWNERS or ALYESKA.

---

4. *See also Western States Bankcard Ass'n v. City and County of San Francisco,* 19 Cal.3d 208, 137 Cal.Rptr. 183, 561 P.2d 273, 278–79

(1977); *Brady v. Getty Oil Co.,* 376 So.2d 186, 188 (Miss.1979); *Duke v. Bureau of Revenue,* 87 N.M. 360, 533 P.2d 593, 594 (App.1975).

(Emphasis added.) While a verbalization between the parties as to their relationship is not always effective to alter the true nature of that relationship, *Gregory v. Helvering,* 293 U.S. 465, 469–70, 55 S.Ct. 266, 267, 79 L.Ed. 596, 599 (1935); *but see Higgins v. Smith,* 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940), this truism does not serve as a substitute for evidence of the agency relationship. The contract provision remains a clear manifestation by Alyeska that it did not consent to the taxpayers acting as its agents. Taxpayers have not established that the degree or nature of control exercised by Alyeska over the labor, materials and equipment furnished by the taxpayers is sufficient to justify finding an agency relationship between them. As the Department notes in its original decision:

> The [taxpayers] furnished all required supervision, consultation, construction services, labor, certain field engineering, certain construction tools and equipment and other services as required for the proper field engineering and pipeline construction work, as well as furnish all necessary procurement services and purchase or otherwise provide all equipment, materials, supplies and spare parts, except as may be provided by Alyeska. Further, the [taxpayers] were required to furnish all subcontracted services, construction utilities and supplies, small tools and temporary structures and facilities, except as may be provided by Alyeska.

> The [taxpayers] were also required by their contracts to pay all taxes relating to their work. These taxes included such taxes as sales, excise, use, income, gross receipts, personal property and all employment taxes.... Such authority and responsibility of the [taxpayers] as delegated under the contractual terms do not suggest an agency relationship with Alyeska.

Under similar circumstances, other courts have rejected the argument that an agency relationship existed between the parties. *United States v. New Mexico,* 455 U.S. 720, 739–40, 102 S.Ct. 1373, 1384–85, 71 L.Ed.2d 580, 595–96 (1982); *Independent Casting-Television, Inc. v. City of Los Angeles,* 49 Cal.App.3d 502, 122 Cal.Rptr. 416, 419–20 (1975).

The taxpayers rely upon the decision of the California Court of Appeal in *City of Los Angeles v. Meyers Brothers Parking System, Inc.,* 54 Cal.App.3d 135, 126 Cal. Rptr. 545 (1975). In that case, the court found Meyers to be both an independent contractor and the agent of the owner of a parking facility. The taxpayers urge this court to apply the decision to the facts of this case and conclude that the taxpayers were the agents of Alyeska. We believe that the decision in *Meyers Brothers* is distinguishable. The taxpayer in that case simply carried out the management decisions of its principal, who had already determined all questions regarding the parking rate, validations, parking privileges and personnel. 126 Cal.Rptr. at 547. Alyeska did not have such management control over the taxpayers in this case.

Even if we were persuaded that the taxpayers were Alyeska's agents, we agree with the Department that AS 43.70.-110(2) does not provide a "blanket exemption for agents from a gross receipts tax." As one court stated, "[t]o interpret an exception to the act so that it will 'encompass *all* relationships whereby one person incurs expenses for another under an agreement to be reimbursed' ... would, in our opinion, ... convert a gross income tax into a net income tax." *Western Adjustment & Inspection Co. v. Gross Income Tax Division,* 236 Ind. 639, 142 N.E.2d 630, 633 (1957). It would appear that that is exactly what the taxpayers wish to do in this case—convert the gross receipts tax into a net income tax. However, AS 43.70.030 is not an income tax that imposes a tax on profits and permits deductions for costs and expenses. The tax is imposed on all money, credits or other consideration received by the taxpayer. *See supra* n. 2.

Tax exemptions are construed narrowly, against the taxpayer. *State v. Alaska Pulp America, Inc.,* 674 P.2d 268, 276 (1983); *Greater Anchorage Area Borough v. Sisters of Charity of the House*

*of Providence,* 553 P.2d 467, 469 (Alaska 1976). We agree with the Department that the exemption provided in AS 43.70.110(2) was intended to apply to persons working on commissions as sales agents for companies that are engaged in the retail sales business and pay taxes under the ABLA on the volume of business done. There is no indication that this exemption was intended to apply to contractors working on the standard "cost-plus fixed fee" construction contract. To the contrary, the language of AS 43.70.110 indicates that the legislature intended to tax construction contractors on the total price of the cost-plus contract. The statute specifically states that gross receipts "means receipts from sources in the state . . . received from engaging in or conducting a business *without deducting the cost of materials used, labor or service cost . . . or any other expense.*" (Emphasis added.) The statute further states that gross receipts "also includes all amounts paid or assigned to subcontractors." Therefore, even if a contractor assigns directly to the subcontractor a payment due from the owner, the contractor must include that amount as a gross receipt of his business.

We hold that taxpayers do not qualify for the "agency exception" to the gross receipts statute. As previously indicated, we also hold that taxpayers "received" the money deposited in their accounts for reimbursable costs. Accordingly, the Department did not err in assessing additional taxes against the taxpayers for these gross receipts.

### IV. PROCEEDS OF SALE AS GROSS RECEIPTS

The last issue on appeal is whether the Department erred in its decision that Green-Associated should have included the proceeds from its sale of equipment to Alyeska as gross receipts in its returns. In 1976 and 1977, Green-Associated sold construction equipment to Alyeska that it had used in its Alaska business operations from 1970 through 1977. Green-Associated received $2,034,958.00 from Alyeska for the equipment. Green-Associated contends that its receipts from these sales are not taxable because there were not receipts from "engaging in or conducting business." AS 43.70.110(1) defines "business" as follows:

"Business" includes all activities or acts, personal, professional, or corporate, engaged in or caused to be engaged in, or following or engaging in a trade, profession, or business, including receipts from advertising services, rental of personal or real property, construction, processing, or manufacturing, but excluding fisheries businesses, fishermen, liquor licenses, insurance businesses, mining, and coin-operated amusement and gaming machines, calling or vocation, with the object of financial or pecuniary gain, profit or benefit, either direct or indirect, and not exempting subactivities producing marketable commodities or services used or consumed in the main business activity, each of which subactivities shall be considered business.

The statute further provides that "the furnishing of property, services, substances, or things, by a person who does not hold himself out as regularly engaging in those transactions, does not constitute business under the meaning of this chapter." AS 43.70.110(1). Green-Associated asserts that it did not hold itself out as being in the business of selling equipment. According to Green-Associated, its sale of construction equipment at the end of the equipment's useful life constituted an isolated and collateral event.

The Department contends that the definition of business is "all-encompassing and evidences a legislative intent to tax virtually every business activity of a taxpayer. . . . The exemption protects truly isolated transactions and not, as this taxpayer contends, any transaction that a taxpayer alleges is secondary to (*i.e.,* a subactivity of) its principal line of business." The Department observes that Green-Associated has presented no evidence on the total number of sales it has made in Alaska or out-of-state which could substantiate its claim that these sales were isolated. As the

Department indicates, however, the issue is not so much the number of transactions entered into by the taxpayer, but "whether the sale or lease is in line with the business for which the seller or the lessor was organized and in which it engages." *Besser Co. v. Bureau of Revenue,* 74 N.M. 377, 394 P.2d 141, 146 (1964).[5] The following facts are undisputed in this case: first, Green-Associated is engaged in the "business" of construction; second, the construction equipment Green-Associated sold to Alyeska was used in connection with that business; third, a contract provision requiring Green-Associated to sell all of its tools, equipment and property upon completion of its work for Alyeska indicates that the sale of this equipment was contemplated as part of Green-Associated's normal business; and fourth, the business manager for the taxpayers testified that the sale of construction equipment at the end of the equipment's useful life was the normal practice of the taxpayers. Under these circumstances, we conclude that Green-Associated's sale of equipment to Alyeska was a part of the business in which it was engaged. Green-Associated should therefore have included the money it received from the sales in its gross receipts. The Department did not err in assessing additional taxes against Green-Associated on this basis.

The Department's assessment of additional taxes against the taxpayers is AFFIRMED.

---

**5.** *See also Pacific Pipeline Construction Co. v. State Board of Equalization,* 49 Cal.2d 729, 321 P.2d 729 (1958).