[No. A015288. First Dist., Div. Two. Dec. 18, 1984.]

CITY AND COUNTY OF SAN FRANCISCO,
Plaintiff and Respondent, v.
CARPENTER FUNDS ADMINISTRATIVE OFFICE
OF NORTHERN CALIFORNIA, INC., Defendant and Appellant.

COUNSEL

Van Bourg, Allen, Weinberg & Roger, Victor J. Van Bourg and David A. Rosenfeld for Defendant and Appellant.

Robert L. Fletcher, Jr., for Plaintiff and Respondent.

OPINION

**ROUSE, J.**—Defendant Carpenter Funds Administrative Office of Northern California (CFA) appeals from a judgment against it for $176,822.18 plus interest in an action that was brought by the Tax Collector of the City and County of San Francisco (City) to recover unpaid payroll expense taxes for the years 1970-1979 inclusive.[1]

In 1970, the San Francisco Payroll Expense Tax Ordinance (Ordinance), San Francisco Municipal Code, part III, article 12-A, section 901 et seq. became effective. Section 903 of the Ordinance provides, inter alia, that "A tax for general revenue purposes is hereby imposed upon every person who, in connection with his business, engages, hires, employs or contracts with one or more individuals as Commission Merchant or Employee, to perform work or render services in whole or in part within the City and County of

---

[1]The City filed its original complaint in 1977, seeking to recover unpaid taxes for the years 1970-1976. Prior to entry of judgment in 1981, the City filed a supplemental complaint seeking unpaid taxes for the years, 1977 through 1979. The judgment was based on. the supplemental complaint which, pursuant to a stipulation by the parties, was ordered by this court to be included in the record on appeal.

San Francisco." In general, the Ordinance imposes a tax that is based on a fixed percentage of the salaries paid to employees. (Ord., § 903.)

In 1977, the City tax collector commenced this action against CFA to collect unpaid back payroll expense taxes under the Ordinance. In 1981, the matter was tried in the San Francisco Superior Court. Two witnesses testified. In December 1981, the trial court issued findings of fact and conclusions of law and thereafter entered judgment for the City. The record, including the court's factual findings, reveals the following:[2]

In 1953 the Carpenters' Health and Welfare Trust Fund for Northern California (Health and Welfare Fund) was created, and later in 1957 the Carpenters' Pension Fund for Northern California (Pension Fund) was created. Employees of the Health and Welfare Fund provided administrative services for both funds. However, in 1963, at the suggestion of the Internal Revenue Service (IRS), but not because of any regulatory or statutory requirement, the trustees of both funds created CFA for the sole and exclusive purpose of providing administrative services to these funds and other carpenters' trust funds that were subsequently created.[3]

The trustees of the participating trusts appointed CFA's Board of Directors which exercises exclusive control over CFA's activities, including labor relations, day-to-day operations, and financial policies. The reasons for creating a separate administrative corporation were that it prevented the appearance of or actual comingling of trust funds, eliminated duplicative administrative services, and was cost efficient both for the participating trusts and the employers who made contributions to them. Each trust, however, could have properly performed its own administrative services or hired a professional outside administrator.

From 1970-1979, CFA's revenues were its operating and salary expenses that it recovered on a pro rata basis from each of the participating trusts. CFA also recovered its costs for rendering computer and mailing services to related entities such as local unions, district councils and employer associations. During this time, CFA's operating expenses alone ranged from $1 to $2.9 million and its salary expenses from $500,000 to $1.6 million. CFA collected these amounts and deposited them in its own bank account.

---

[2] As CFA notes, the essential facts of this case are not in dispute.

[3] During the years 1970-1979, CFA also provided services for the Five Bay Area Counties Vacations Trust Fund; the 41 Counties Vacation Trust Fund; the 46 Counties Vacation Trust Fund; the Apprenticeship Trust Fund; the Construction Industry Advancement Trust Fund; and the Mill Cabinet Health and Welfare/Pension Trust Fund. Hereafter, all of the trusts will be referred to collectively as the participating trusts.

Although CFA never applied for or obtained a formal IRS tax exemption, it paid no federal income taxes because its revenues equalled its expenses. However, CFA paid federal payroll taxes. CFA also filed standard state corporate franchise tax returns, paying the minimum amount of tax required by California law. CFA filed personal property tax statements and paid county ad valorem taxes on its personal property.

I.

CFA contends that it is not liable for the payroll expense taxes because it comes within the exemption provision in the Ordinance. This provision, section 906 of the Ordinance, specifically exempts any "organization described in Section 501(c) or 501(d) or 401(a) of Title 26 of the United States Code, as qualified by Sections 502, 503 and 504 of Title 26 of the United States Code . . . ." The participating trusts are clearly exempt under the Ordinance because they are "described" in 26 United States Code section 501(c)(9), which provides a federal exemption to "voluntary employees' beneficiary associations" such as pension and welfare trust funds. (See *Nelson* v. *Joyce* (N.D.Ill. 1975) 404 F.Supp. 489, 490.) CFA claims that it shares this exempt status.

There is no case law interpreting the Ordinance's exemption provision. However, the language of the provision is taken from 26 United States Code section 501(a), and the Ordinance incorporates by reference the federal exemptions enumerated in section 501(c) and 501(d). Under these circumstances we consider it appropriate to use federal cases and practice as a guide in determining the meaning of the exemptions that were incorporated in the Ordinance. (Cf. *Englund* v. *Chavez* (1972) 8 Cal.3d 572, 589-590 [105 Cal.Rptr. 521, 504 P.2d 457].)

In deciding whether a particular organization is "described" in one of the exemptions, federal courts have developed the following rule: "[W]here one organization serves as a mere adjunct for a primary organization by providing services which are essential to the functioning of the primary organization and which would be normally performed by it, the adjunct will acquire the tax status of the primary company." (*Trustees of Graceland Cem. Imp. F.* v. *United States* (Ct. Cl. 1975) 515 F.2d 763, 771.) This rule has been applied where, as here, tax-exempt organizations form an adjunct nonprofit service corporation. Thus, for example, where tax exempt hospitals have joined together and formed separate nonprofit corporations to purchase medical supplies in bulk or provide laundry service or electronic data processing services, the courts have granted these corporations the same exemptions that the hospitals enjoyed. (See *Northern*

*Cal. Cent. Services, Inc.* v. *U.S.* (Ct. Cl. 1979) 591 F.2d 620, 626-627; *Chart, Inc.* v. *United States* (D.D.C. 1979) 491 F.Supp. 10; *Hospital Bureau of Standards & Sup.* v. *United States* (Ct. Cl. 1958) 158 F.Supp. 560.) Similarly, where a tax-exempt college formed a corporation to run a bookstore and restaurant on the campus, the corporation was granted an exemption because of its "close and intimate relationship to the functioning of the College itself." (*Squire* v. *Students Book Corp.* (9th Cir. 1951) 191 F.2d 1018, 1020.)

 In this case CFA performs essential and crucial services that the tax-exempt participating trusts would normally perform themselves. CFA collects the contributions to the various trust funds, administers these funds, and disburses benefits. CFA performs at once what each of the individual trusts would have to do for itself. Thus by centralizing its administrative services, the trusts realize significant cost savings. Given its function and the fact that CFA has never operated for or at a profit and is exclusively controlled by the tax-exempt nonprofit participating trusts, we believe that it is both reasonable and proper to adopt the federal rule and find that CFA enjoys the same exemption as the participating trusts.

The City contends that CFA cannot enjoy this exemption because it has never sought and the IRS has never granted CFA a formal exemption under 26 United States Code section 501(c). The City argues that without an actual federal exemption, this court is forced to "speculate as to what the Commissioner of Internal Revenue's response would be if [CFA] ever formally applied for tax exempt status under any of the applicable sections of the Internal Revenue Code." We are not persuaded.

The Ordinance does not make the possession of a formal federal tax exemption a prerequisite to being exempt from its provisions. Rather, it exempts organizations that are "described" in certain sections of the Internal Revenue Code. These sections are part of the Ordinance by specific reference. Our concern in this case is simply to construe the Ordinance. As noted above, we are guided by federal cases and practice in determining the meaning of the exemptions that the Ordinance has "borrowed" from the federal statutes. However, what the IRS itself might do with a formal application from CFA for exemption from *federal taxes* is irrelevant. Nothing in the Ordinance requires action by the IRS before we can determine whether CFA is exempt under the Ordinance.

The City also claims that the California Supreme Court rejected CFA's contention that it can share the tax exempt status of the participating trusts

by its decision in *Western States Bankcard Assn.* v. *City and County of San Francisco* (1977) 19 Cal.3d 208 [137 Cal.Rptr. 183, 561 P.2d 273].

*Western States Bankcard* involved a nonprofit corporation formed by numerous banks to administer their credit card operations. Under the California Constitution, the banks paid an "in lieu" tax on their banking activity and were exempt from all other state and local taxes. (Cal. Const., art. XIII, § 27; Rev. & Tax. Code, §§ 23181, 23182.) The nonprofit corporation sought to share this exemption. Specifically the corporation sought to avoid the payroll expense tax at issue here. It argued that by taxing it, the Ordinance was, in effect, a direct tax on the banks, which was prohibited. Although the court recognized that the member banks bore the economic burden that the tax imposed on their adjunct service corporation, the court rejected the corporation's argument. The court found that the corporation was a legally separate entity and that the legal incidence of the tax fell on it, not on the member banks. Moreover, the court noted that having chosen to create an adjunct corporation because of its peculiar benefits, "the member banks may fairly and reasonably be required to accept the tax burdens necessarily attendant upon that form." (*Id.*, at p. 220.)

We find *Western States Bankcard* to be distinguishable from this case. Here, the participating trusts are exempt under the Ordinance and from federal taxation because they are "voluntary employees' beneficiary associations" that is, welfare and pension funds organized and governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 United States Code section 1001 et seq. ■ ERISA is a "comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." (*Shaw* v. *Delta Air Lines, Inc.* (1983) 463 U.S. 85, 90 [77 L.Ed.2d 490, 497, 103 S.Ct. 2890, 2896]; see *Alessi* v. *Raybestos-Manhattan, Inc.* (1981) 451 U.S. 504, 510 [68 L.Ed.2d 402, 408-409, 101 S.Ct. 1895]; *In re Marriage of Campa* (1979) 89 Cal.App.3d 113, 121-122 [152 Cal.Rptr. 362].) Obviously, the federal exemption, and by implication the exemption under the Ordinance, was aimed at promoting and protecting such benefit funds. Indeed, federal regulation and protection of such plans was considered sufficiently important that Congress included a specific preemption provision in ERISA, which states that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employment benefit plan. . . ." (29 U.S.C. § 1144(a).)[4]

In contrast, the "in lieu" tax on the banks in *Western States Bankcard* and the exemption from other state and local taxes which the banks enjoy

---

[4]CFA claims that the City's Ordinance is preempted by this section of ERISA. In light of our holding it is unnecessary to address this claim.

was not designed to promote banking business or any important social, welfare or labor policy. Rather, the state's "in lieu" tax simply made it possible for the state to tax national banks. (*Western States Bankcard, supra,* 19 Cal.3d 208, 215-216.) "To achieve tax-rate parity between national and state banking institutions, a prerequisite for *any* tax upon national banks, California adopted the federally designed in lieu tax on net income and made it applicable to all banks located within the state." (*Id.,* at pp. 215-216; italics in original.)

Moreover, the participating trusts here are nonprofit organizations which exist solely to provide benefits to their contributing members. CFA performs functions that are intimately connected and essential to the trusts' noncommercial purpose. The banks, on the other hand, are profit-making enterprises. Their credit card service corporation did not perform traditional banking functions; but rather it expanded the banks' commercial activities and capabilities. (19 Cal.3d at pp. 213-216.)

In our view, the differences between employee benefit trusts and national banks, between their respective tax exemptions, and between their adjunct service corporations are so fundamental and distinct that neither the reasoning nor holding in *Western States Bankcard* is applicable to the facts of this case. Moreover, the court in *Western States Bankcard* could find no discernible policy basis for extending exemption benefits to the banks' credit card service corporation. ▮ However, we conclude that the important public policies behind employment benefit plans are furthered by extending the participating trusts' exemption to CFA. Such an exemption directly helps to protect the funds themselves. No doubt, if we found that CFA was not exempt, then the Ordinance would have a negative financial impact on the trusts because it is the trusts that are ultimately responsible for CFA's taxes. Thus, if CFA is not exempt, the trusts must choose between paying the tax or dismantling CFA and losing its cost savings benefits. Either way, the available funds in the trusts are reduced. We do not believe that the Ordinance was designed either to increase the internal administrative costs of the participating trusts or to reduce the funds in them by indirect taxation. By extending the trusts' own clear tax exemption to CFA, we can prevent such unintended consequences.

Therefore, in light of our discussion, we hold that where, as here, nonprofit, tax-exempt employment benefit plans create an independent nonprofit adjunct corporation to provide essential administrative services, that adjunct corporation is exempt from the Ordinance at issue here.[5]

---

[5] Given our holding, we need not discuss CFA's remaining contention that it independently qualifies for its own exemption under 26 United States Code section 501(c)(2).

The judgment is reversed.

Kline, P. J., and Smith, J., concurred.

A petition for a rehearing was denied January 16, 1985, and respondent's petition for a hearing by the Supreme Court was denied February 20, 1985.