Thomas K. WILLIAMS, Commissioner, Department of Revenue, State of Alaska, Appellant,

v.

BP ALASKA EXPLORATION, INC., Appellee.

Thomas K. WILLIAMS, Commissioner, Department of Revenue, State of Alaska, Appellant,

v.

BP ALASKA, INC., Appellee.

No. 7035.

Supreme Court of Alaska.

Dec. 16, 1983.

Martha A. Fox, Asst. Atty. Gen., Norman C. Gorsuch, Atty. Gen., Juneau, for appellant.

Joseph M. Wilson, Ely, Guess & Rudd, Anchorage, for appellee.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

This appeal involves disputed assessments by the Department of Revenue (Department) under the Alaska Business License Act (ABLA) [1] for taxpayers' activities in the years 1972 through 1975.[2]

The major controversy in this litigation is whether the Department properly concluded that 695 million dollars were "gross receipts" for ABLA purposes. This money was received by the taxpayers under a series of "operating agreements" where one or the other of the taxpayers acted as the "operator" of certain oil, gas, and mineral leases within Alaska. The responsibilities of the operator included the management, exploration, and development of the lease. In every case where BPA or BPAE acted as an operator, it owned a part interest in the lease. The non-operating co-interest holders were other oil and gas companies. Each interest holder, whether operator or not, paid a percentage of the operating expenses in proportion to the in-

terest holder's ownership share. The operator made all the initial expenditures, for which it would be reimbursed by the non-operators at a later time. There is no dispute that the operator was reimbursed only for its costs under the agreements, that there was no management fee paid to the operator, and that the agreements were designed so that the operator could not realize a monetary profit through its role as operator.[3]

In 1978 the Department audited the taxpayers, and concluded that all monies (the 695 million dollars) received from non-operators under the operating agreements should have been included in the calculation of the taxpayers' gross income for 1972–1975. The Department issued a final assessment for additional business license taxes for these years on December 18, 1978. Each taxpayer timely filed a Notice of Grievance and Request for Hearing. Formal hearings were held and the hearing examiner issued a decision which was adopted by the Commissioner of the Department. The hearing examiner found the

---

1. Former AS 43.70.030(a) provided that:

    (a) the license fee for each business is $25 plus a sum equal to one-half of one per cent of the gross receipts in excess of $20,000 from the business during the year for which the license is issued, except that all gross volume in excess of [$100,000] a year is taxed at the rate of one-quarter of one per cent. The annual license fee paid by a professional person to his professional board shall be credited against the initial fee required under this chapter.

    AS 43.70.030(a) was amended in 1978 and now contains no provision for the levy of a license fee against the gross volume of a taxpayer's business. The current version of section 030(a) reads simply as follows:

    The license fee for each business is $25. The assessments at issue in the instant case are for tax periods three or more years before the elimination of the gross receipts tax.

2. In the Department's view taxpayers BP Alaska, Inc. (BPA) and BP Alaska Exploration, Inc. (BPAE) underreported their gross receipts during those years by a combined total of $695,278,228.00. Under former AS 43.70.030(a) the Department on December 18, 1978, made assessments of tax plus interest in the amount of $2,099,483.00 against BPA and $75,974.00 against BPAE.

For BPA:

|          | 1972    | 1973    | 1974    | 1975      |
|----------|---------|---------|---------|-----------|
| Tax      | 69,505  | 140,803 | 349,936 | 1,117,990 |
| Interest | 27,868  | 48,010  | 98,324  | 247,047   |
| Total    | 97,373  | 188,813 | 448,260 | 1,365,037 |

For BPAE:

|          | 1972   | 1973   | 1974   | 1975   |
|----------|--------|--------|--------|--------|
| Tax      | 4,217  | 4,398  | 16,634 | 35,105 |
| Interest | 1,689  | 1,500  | 4,680  | 7,751  |
| Total    | 5,906  | 5,898  | 21,314 | 42,856 |

3. The operating agreement between BPA and Sohio under which BPA was designated operator of all of Sohio's holdings in Prudhoe Bay is illustrative. Although Sohio held a 100% interest in the Prudhoe leases, BPA possessed a 75% net profits royalty interest in the daily production of the leases when this production exceeded a certain level. As operator BPA assumed the duty to manage, develop, and explore the Prudhoe properties. Sohio agreed to reimburse BPA for all expenses BPA incurred as operator. The contract contained no management fee due to BPA for its activities. It is undisputed that BPA was reimbursed for its costs only, and that no profit to BPA was possible under the agreement. During the years in question BPA made operating expenditures and was reimbursed by Sohio.

taxpayers liable for all[4] of the additional assessment.[5]

On appeal from the Department's ruling, the superior court reversed the hearing officer's decision. The superior court concluded that the taxpayers' reimbursed costs under the operating agreements could not be considered gross receipts under the statutory definition. It thus struck down all assessments for the years 1972–1975. Alternatively, the court held that newly-enacted AS 43.05.260(a), which bars the collection of claims more than three years old by the Department, should be given retroactive effect to preclude assessments against the taxpayers for 1972–1974. The Department now brings this appeal.

## I. STATUTE OF LIMITATIONS.

■ On appeal taxpayers present separate arguments, based upon AS 43.05.260(a) and AS 43.70.040(a), to show that the assessments made against them for 1972–1975 were untimely.

AS 43.05.260(a) was enacted in 1976. It provides that all assessments by the Department must be made within three years after a taxpayer files his return or else the tax may not be collected.[6] The superior court held that section 260(a) should be applied retroactively to all returns filed prior to its enactment. The superior court thus found that the gross receipts assessments against BPA and BPAE for 1972–1974 were not enforceable.

In *State v. Alaska Pulp America, Inc.*, 674 P.2d 268 (Alaska, 1983), we held that AS 43.05.260(a) will not be given retroactive effect to apply to returns filed before 1976. *See also Green Construction Co. v.*

*State*, 674 P.2d 260 (Alaska, 1983). Accordingly, we reverse this portion of the superior court decision.

■ Taxpayers also raised an alternative time bar argument below based upon AS 43.70.040(a), which provides:

As soon as practicable after the final payment of the tax, the department shall examine the return and determine the correct amount of the tax and, if an error is found, shall notify the taxpayer of the error and examine the taxpayer's records as authorized in AS 43.05.040, and take other proper steps to determine the amount due.

We reject taxpayers' reliance upon AS 43.70.040(a) for the following reasons. Arguing that AS 43.70.040(a) has no application to the audit and additional assessments which were issued against taxpayers, the Department asserts that "[t]he subsection applies only to the review of a return for error, and subsequent examination of taxpayer records to correct an error and determine the proper amount of tax due." We think the Department's analysis is correct and hold that AS 43.70.040(a) applies only to errors which are apparent on the face of a return.

■ Alternatively, assuming the applicability of AS 43.70.040(a), we reject taxpayers' argument that the Department delayed for an unreasonable time in making the assessments in question. Taxpayers focus upon the portion of AS 43.70.040(a) which provides that "[a]s soon as practicable after the final payment of the tax, the department shall examine the return and determine the correct amount of the tax." They

---

4. The hearing examiner concluded that BPAE was not liable for certain loans and payments made to BPAE for operations in the Baltimore Canyon off the Atlantic coast of the United States. These latter issues were not part of taxpayers' appeal to the superior court.

5. The hearing examiner concluded that the major purpose of the operating agreements was indeed "cost reimbursement," as the taxpayers contended, but that these reimbursements were nevertheless "gross receipts" within the definition set forth in AS 43.70.110(2).

6. . AS 43.05.260(a) provides in full:

Except as provided in AS 43.20.200(b), the amount of a tax imposed by this title must be assessed within three years after the return was filed, whether or not a return was filed on or after the date prescribed by law. If the tax is not assessed before the expiration of the three-year period, no proceedings may be instituted in court for the collection of the tax.

Section 260(a), enacted May 27, 1976, was made retroactive to January 1, 1976. *See* Ch. 94, § 5, SLA 1976.

contend that "as soon as practicable" must be taken to mean "within a reasonable time." They further contend that the Department's delay of periods ranging from 2½ years in making its 1975 assessment, to 5½ years for the 1972 assessment, must be considered unreasonable.

Even accepting taxpayers' assertion that AS 43.70.040(a) provides a statutory time bar at the expiration of a "reasonable time," taxpayers suggest no criteria for judging the reasonableness of the Department's delay. They have advanced no factual argument to show that the delays here were unreasonable.[7]

The Department, on the other hand, argues that administrative efficiency sometimes requires deferral of the review and assessment process to permit the examination of a number of tax periods at one time. The former practice of the Department prior to the enactment of a three-year statute of limitations was to review a taxpayer's ABLA returns for five or six tax periods at a time. Indeed, the statute of limitations formerly applicable to Department actions to collect tax, AS 09.10.120, ran for six years. Given these facts, we hold that the delays in question were not unreasonable.

## II. WHETHER REIMBURSEMENTS RECEIVED WERE "GROSS RECEIPTS".

■ We now turn to the question of whether the reimbursements received by the taxpayers under the operating agree-

ments were "gross receipts," taxable under former AS 43.70.030(a). Gross receipts are defined in AS 43.70.110(2) as "receipts from sources in the state, whether in the form of money, credits, or other valuable consideration received from engaging in or conducting a business without deducting the cost of the property sold, the cost of materials used, labor or service cost, interest paid, taxes, losses, or any other expense...."[8]

There is no question that taxpayers received "money, credits, or other valuable consideration" when they were reimbursed by non-operators for their expenditures as operators. *Green Construction Co. v. State*, 674 P.2d 260, 264–265. In *Green* we were confronted with a problem of statutory construction of the word "receipt" under AS 43.70.110(2). The taxpayers were construction contractors who had entered into agreements with Alyeska. Taxpayers were paid for a category of expenses designated "reimbursable costs" and received separately a fixed fee for their services. Reimbursements were handled as follows:

> The taxpayers opened "zero balance bank accounts" to receive and disburse money for these items. When a taxpayer incurred a reimbursable cost, it would write a check on the account and notify Alyeska. Upon approval, when necessary, Alyeska would deposit the amount of money into the account from one of its own accounts.

7. We find untenable taxpayers' assertion that the 2½ years delay in regard to the 1975 assessment was unreasonable, when the current limitations period under AS 43.05.260(a) is three years.

8. AS 43.70.110(2) provides in full:
"Gross receipts" means receipts from sources in the state, whether in the form of money, credits, or other valuable consideration received from engaging in or conducting a business without deducting the cost of the property sold, the cost of the materials used, labor or service cost, interest paid, taxes, losses, or any other expense, except that "gross receipts" does not include cash discounts allowed and taken on sales, and sales refunds, either in cash or by credit, uncollectible accounts written off, and payments received in final liqui-

dation of accounts included in the gross receipts of a previous return made by the person. Receipts from sales, wherever made, of goods, wares, and merchandise manufactured or processed or originating in the state are considered a part of gross receipts from sources in the state, and the holder of a state license under this chapter doing business inside and outside the state is liable under this chapter as to that portion of his gross receipts attributable to his Alaska operation. "Gross receipts" also includes all amounts paid or assigned to subcontractors. Individuals representing firms taxed under this chapter on volume of business done, working as agents on commission instead of as employees, may compute their gross receipts as equal to their gross commissions.

674 P.2d at 263. The taxpayers in *Green* argued that Alyeska's deposits into the zero balance accounts were not "receipts" because the funds went directly toward debts incurred on behalf of Alyeska, and because the taxpayers exercised no dominion over the accounts. *Id.* at 264. We rejected the contention that the debts incurred by the taxpayers were really Alyeska's debts, and based our holding upon the ground that:

> [T]he taxpayers do not dispute the Department's assertion that if Alyeska refused to advance any particular cost, the creditor would look to the taxpayer, rather than Alyeska, for payment. Contrary to the taxpayers' contention, the funds passing through the zero balance bank accounts were not "amounts which Alyeska ... disbursed directly to third parties." The underlying arrangement remained one in which the taxpayers incurred certain obligations in the course of their business with Alyeska, for which Alyeska reimbursed them.

*Id.* at 264.

BPA and BPAE raise much the same arguments as those raised in *Green.* They argue that their reimbursed expenses under the operating agreements should not be considered "receipts" because they were in fact incurred on behalf of the non-operators. So far as their position on appeal is based upon the structure of the reimbursement mechanism alone, we hold that *Green* is dispositive.

■ The major controversy regarding the "gross receipts" issue centers upon whether taxpayers were "engaged in or conducting a business" while participating in the operating agreement. AS 43.70.-110(1) defines "business" as "all activities ... engaged in ... with the object of financial or pecuniary gain, profit or benefit, either direct or indirect...."[9] BPA and BPAE claim that the operating agreements produced no profit or benefit of any kind. They assert that the agreements were mere cost-sharing mechanisms designed not to generate revenue, but to allocate expenses. Although they concede that they were engaged in the business of producing oil and gas, appellees argue that the Department's assessment levies the gross receipts tax on their business at a point before any receipts have come in.

The Department takes issue with taxpayers' claims that they realized no benefit as operators. It suggests that the "agreements provided taxpayers with both direct and indirect financial benefits." In the Department's view, the taxpayers were benefited by economies of scale, efficiencies resulting from pooled resources, and their ability to control the manner of development of properties in which they had an interest. Also, the Department asserts that the non-operators paid all or most of the initial exploration and development costs for the leases.

Taxpayers believe that the license tax attaches only to activities which are "for profit." They place emphasis upon the appearance of the word "profit" in the statutory definition of "business" and suggest that the word "profit" "suppl[ies] the interpretive context for the words 'gain' and 'benefit'" in AS 43.70.110(1). The Department contends to the contrary that "business" is more broadly defined in section 110(1) than merely "for-profit" activity. It argues that a natural reading of the defini-

---

**9.** AS 43.70.110(1) provides in full:

"Business" includes all activities or acts, personal, professional, or corporate, engaged in or caused to be engaged in, or following or engaging in a trade, profession, or business, including receipts from advertising services, rental of personal or real property, construction, processing, or manufacturing, but excluding fisheries businesses, fishermen, liquor licenses, insurance businesses, mining, and coin-operated amusement and gaming machines, calling or vocation, with the object of financial or pecuniary gain, profit or benefit, either direct or indirect, and not exempting subactivities producing marketable commodities or services used or consumed in the main business activity, each of which subactivities shall be considered business. The giving or supplying of services as an employee and the furnishing of property, services, substances, or things, by a person who does not hold himself out as regularly engaging in those transactions, does not constitute business under the meaning of this chapter.

tion also includes all activities undertaken for financial gain or benefit, even where the possibility of actual profits is foreclosed.

Given the wording of AS 43.70.110(1), and our review of relevant case law, we conclude that the hearing examiner was correct in finding that taxpayers engaged in business by virtue of their activities as operators.[10] Most other jurisdictions have employed expansive definitions of "gain, benefit, or advantage" when taxable "business activity" has been defined in these terms. In *Bonnar-Vawter, Inc. v. Johnson*, 157 Me. 380, 173 A.2d 141 (1961), the court held that a subsidiary selling materials to a parent at cost must be assumed to reap an advantage from the arrangement.

At the very least, the court found that the subsidiary received a benefit in payments toward the overhead costs necessary to its continued operation. *Id.* at 144.[11] A similar conclusion was reached in *Kansas City v. Standard House Improvement Co., Inc.*, 512 S.W.2d 915 (Mo.App.1974), where one corporation supplied another corporation with labor and materials at cost. Even though the two corporations had the same shareholders, officers, and directors, and all transactions were on a break-even basis, the court concluded that the receipts to the supplier corporation were properly included as "gross receipts" for license tax purposes. *Id.* at 917. *Accord, Shelburne Sportswear, Inc. v. City of Philadelphia*, 422 Pa. 199, 220 A.2d 798, 801–802 (1966);[12]

---

**10.** The hearing examiner found that the main purpose of the operating agreement was cost reimbursement, and assumed for purposes of argument that the operators did not and could not realize a profit from their activities. Although the hearing examiner did not make specific findings regarding the nature of the benefit or gain realized by BPA and BPAE in this case, he cited and relied upon decisions where efficiency of operation and promotion of good will provided adequate benefit to the taxpayers so that the underlying activity was found by the court to be a business activity.

The Department at the administrative hearings developed testimony regarding BPA and BPAE's motivation in entering the operating agreements. David Porras, manager of tax audits for Standard Oil Company of Ohio, testified that the oil company with the greatest economic interest in the lease will usually be designated operator. He stated that the operator derives no benefit as a result of this designation; it is merely a consequence of the fact that only one company can operate a lease at one time. He also stated, however, that the operator enjoys some flexibility regarding the manner in which the lease is developed, subject to budgetary constraints imposed by the non-operating owners. Further, at least with respect to BPA's agreement with Sohio, Mr. Porras stated that BPA's position as operator was advantageous to it in that it allowed BPA to protect its net profits royalty interest in the lease. *See supra* note 3 for a description of the BPA-Sohio agreement.

Frederick J. Grossman, the treasurer of BPAE, testified that the operating agreements were designed to spread the risk among a number of oil companies. He stated that whether the operator derives benefit from the agreement "is a matter of conjecture." He supported Mr. Porras' testimony that the operator enjoys "day

to day" control over the lease subject to the budgetary approval of the non-operators.

**11.** In *Bonnar-Vawter* the State of Maine assessed its use tax against a parent corporation which bought printing plates at cost from its wholly-owned subsidiary. Although it was stipulated that the subsidiary made no profit on the transactions, the court concluded that the subsidiary was in the business of selling the plates. Under the Maine statute:

"Business" includes any activity engaged in by any person or caused to be engaged in by him with the object of gain, benefit or advantage, either direct or indirect.

173 A.2d at 143. The court noted that "the statute does not use the word 'profit'" and found that "[t]hese words have a broader meaning than that of the word 'profit.'" *Id.* at 144. The court concluded that the subsidiary fell within the definition because it received the benefit of reimbursements for taxes, overhead, and depreciation under the break-even contract with its parent. *Accord, Community Telecasting Service v. Johnson*, 220 A.2d 500, 504 (Maine 1966).

**12.** *Shelburne* again involved two corporations with common ownership and common directors. Philadelphia assessed its municipal mercantile tax upon the manufacturing corporation which supplied its affiliate with merchandise at cost. The court upheld the tax even though it found that the taxpayer "operates in a state of economic stasis, showing neither profit nor loss." 220 A.2d at 799. The court found that the taxpayer realized a "gain or profit" as required by the ordinance, but emphasized that it was not relying upon a narrow definition of "profit."

"Profit does not necessarily mean a direct return by way of dividends, interest, capital account, or salaries. A saving of expense

*Troy v. Lumberman's Clinic,* 186 Wash. 384, 58 P.2d 812, 816 (1936). In *Bank of America National Trust and Savings Ass'n v. State Board of Equalization,* 209 Cal.App.2d 780, 26 Cal.Rptr. 348 (1963), the court found that the betterment of a bank's relations with its customers was a sufficient benefit to render the sale of personal checks at a loss a taxable "business" activity. *Id.* at 358.

*Brady v. Getty Oil Co.,* 376 So.2d 186 (Miss.1979), is the closest case on its facts to the instant controversy. In *Getty,* the taxpayer was an oil company-operator of gas, oil, and mineral leases receiving reimbursements for its operating expenses from other non-operators. The Mississippi Supreme Court found that the taxpayer received a benefit in the form of increased efficiency, and therefore concluded the taxpayer was doing business within the statutory definition. *Id.* at 188.

We hold, in light of the foregoing, that under the operating agreements BPA and BPAE were engaged in business, as that term is defined in AS 43.70.110(1).[13]

### III.   LOWER 48 EXPENSES.

The taxpayers raise the argument that "receipts attributable to activities or transactions outside Alaska ... are not taxable." They state that any such assessments contravene the due process guarantees of the state and federal constitutions, and the commerce clause.

BPA and BPAE contend that certain of their reimbursable expenditures took place out of Alaska and that reimbursements for these should be excluded in calculating

---

gross receipts under AS 43.70.110(2). They point out that the license tax is levied "upon the privilege of engaging in business *in the state*" and "is measured by receipts from sources *in the state.*" *See* AS 43.70.- 020; AS 43.70.110(2).

We have concluded that taxpayers' argument on this point is without merit. Taxpayers' suggestion that their out-of-state expenditures are the transactions taxed under the ABLA is incorrect. The license tax is levied against money received from non-operators in Alaska under Alaska operating agreements.[14]

The superior court's judgment is RE-VERSED.

COMPTON, J., not participating.

---

which would otherwise necessarily be incurred is also a profit to the person benefited."
*Id.* at 802, quoting *Troy v. Lumberman's Clinic,* 186 Wash. 384, 58 P.2d 812, 816 (1936).

**13.** Our resolution of this issue necessarily implies rejection of taxpayers' reliance on *Bethlehem Mines Corp. v. Haden,* 153 W.Va. 721, 172 S.E.2d 126 (1969). Not only do we disagree with the court's reasoning, we note that following *Bethlehem Mines,* the West Virginia legislature amended its business tax statute specifically to include reimbursed costs as gross receipts.

*Dailey v. Bechtel Corp.,* 157 W.Va. 1023, 207 S.E.2d 169, 173 (1974). In *Dailey,* the court intimated that but for the doctrine of stare decisis it would be inclined to overrule the *Bethlehem Mines* holding. *Id.* at 173–74.

**14.** The hearing examiner rejected the taxpayers' "lower 48 expenditures" argument. The hearing examiner correctly likened taxpayers to an Anchorage auto dealer who buys cars out-of-state, ships them to Alaska, and sells them in Alaska. Clearly the in-state sale is taxable despite the out-of-state character of the preliminary transactions.