**ALYESKA PIPELINE SERVICE COMPANY, as agent for Amerada Hess Pipeline Corporation, Arco Pipe Line Company, BP Pipelines, Inc., Exxon Pipeline Company, Mobil Alaska Pipeline Company, Phillips Alaska Pipeline Corporation, Sohio Pipeline Company, and Union Alaska Pipeline Company, Appellants,**

v.

**Thomas K. WILLIAMS, Commissioner of the Department of Revenue, State of Alaska, Appellee.**

No. 7890.

Supreme Court of Alaska.

Aug. 10, 1984.

---

Charles P. Flynn and Peter J. Maassen, Burr, Pease & Kurtz, Anchorage, for appellants.

Richard D. Monkman, Asst. Atty. Gen., Anchorage, Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

In this appeal Alyeska Pipeline Service Company disputes assessments made by the Department of Revenue (Department) under the Alaska Business License Act (ABLA).[1] The assessments in question pertain to the 1970–1975 tax years. In these years, the Department determined that Alyeska received $3,846,783,189.00 in taxable gross receipts. The Department therefore assessed ABLA taxes in the amount of $655,885.60 for 1970–1973, and additional taxes of $8,951,975.00 for tax years 1974–1975.

Alyeska is a close corporation, owned by a consortium of eight oil companies. Alyeska was the venture manager of the Trans-Alaska Pipeline System (TAPS). It was formed expressly "to design, construct, operate, and maintain petroleum pipeline systems in the State of Alaska and related facilities ...."[2] Alyeska was run through a "Construction Committee" composed of one representative from each of the eight owner corporations, with an additional representative from each owner holding more than a 25% stake in the corporation. It was reimbursed by the owners for expenses incurred in the construction of TAPS, on a pro rata basis, with each oil company contributing a share of the expense proportionate to its ownership interest in Alyeska.

Alyeska maintained a prime account in a New York City bank, as well as maintaining several additional accounts in Alaskan banks. The prime account received deposits directly from the owner companies, who deposited their pro-rata share of the cash required to cover the checks written by Alyeska to pay TAPS expenses. Alyeska provided its owners with both a monthly and weekly forecast of cash requirements.[3] On its ABLA returns for the tax years in question Alyeska reported that it had had no gross receipts which were subject to the license levy.

The Department subsequently assessed, in 1975 and 1978, tax liabilities against

---

1. Former AS 43.70.030(a) provided that
   the license fee for each business is $25 plus a sum equal to one-half of one per cent of the gross receipts in excess of $20,000 from the business during the year for which the license is issued, except that all gross volume in excess of [$100,000] a year is taxed at the rate of one-quarter of one percent. The annual license fee paid by a professional person to his professional board shall be credited against the initial fee required under this chapter. AS 43.70.030(a) was amended in 1978 and now contains no provision for the levy of a license fee against the gross volume of a taxpayer's business.

2. The TAPS project cost approximately eight billion dollars to complete. "[H]undreds of thousands of transactions" were managed by Alyeska during the pipeline construction period.

3. Alyeska used these funds to pay its own operating expenses as well as to pay all amounts it owed to TAPS contractors and subcontractors. Alyeska made payments either from the New York bank account, or by transfer of funds from the prime account to an Alaskan account. In June 1975, Alyeska established a "zero balance bank account" in the New York bank. When checks drawn on this account were presented to the bank, funds from the owners' accounts were automatically transferred to cover them.

Alyeska for the tax years in question. After a hearing, a Hearing Officer affirmed, in all significant aspects, the Department's assessments. The Department subsequently adopted the Hearing Officer's decision in its entirety. Thereafter on appeal the superior court affirmed the Department's decision and this appeal followed.

### I. AS 43.70.040(a) DOES NOT BAR THE TAX ASSESSMENTS AT ISSUE IN THIS APPEAL.

██ Alyeska takes the position that all of the tax assessments in question in this appeal are barred by AS 43.70.040(a), which provides:

> As soon as practicable after the final payment of the tax, the department shall examine the return and determine the correct amount of the tax and, if an error is found, shall notify the taxpayer of the error and examine the taxpayer's records as authorized in AS 43.05.040, and take other proper steps to determine the amount due.

We reject Alyeska's arguments for the reasons we stated in *Williams v. B.P. Alaska Exploration, Inc.*, 677 P.2d 236 (Alaska 1983). There we held that AS 43.70.040(a) applies only to errors which are apparent on the face of a return. *Id.* at 238. Alyeska reported that it had received no gross receipts which were subject to the ABLA. Although a subsequent audit by the Department resulted in an adjustment of

$3,846,783,189, this error was not apparent on the face of the returns. We conclude that AS 43.70.040(a) is not applicable to the Department's subsequent assessment of taxes.[4]

### II. ALYESKA WAS ENGAGED IN "BUSINESS" DURING THE TAX YEARS IN QUESTION, AS THAT TERM IS DEFINED IN THE ABLA.

██ AS 43.70.110(1) defines "business" as "all activities ... engaged in ... with the object of financial or pecuniary gain, profit or benefit, either direct or indirect ...."[5] Alyeska claims that the benefits received from the reimbursements in question went to its owners, not to it. It contends that it did not "profit" at all, in an accounting sense, from its role as venture manager of the construction and operation of TAPS. Alyeska further argues that due to the manner in which it was organized it could not have "profited" from the reimbursements it received from its owners. Accepting these contentions for purposes of argument, we must then focus on the terms "gain", "benefit", and "either direct or indirect" as employed in AS 43.70.110(1).

In *State, Department of Revenue v. Alaska Pulp America*, 674 P.2d 268 (Alaska 1983), the Department had attempted to tax intercorporate transactions among Alaska Pulp's six subsidiaries. The taxpayers' principal substantive defense was that their activities constituted a single "business" for gross receipts tax purposes.

---

4. Even if AS 43.70.040(a) were applicable, we would reject taxpayers' argument that the Department delayed unreasonably in making the questioned assessments. On this record the delays in question were not unreasonable. *See Williams v. B.P. Alaska Exploration, Inc.*, 677 P.2d 236, 238–39 (Alaska 1983). There we held that an even longer delay than the delay at issue here was not unreasonable.

5. AS 43.70.110(1) provides in full:
   "Business" includes all activities or acts, personal, professional, or corporate, engaged in or caused to be engaged in, or following or engaging in a trade, profession, or business, including receipts from advertising services, rental of personal or real property, construction, processing, or manufacturing, but excluding fisheries businesses, fishermen, liquor licenses, insurance businesses, mining, and

coin-operated amusement and gaming machines, calling or vocation, with the object of financial or pecuniary gain, profit or benefit, either direct or indirect, and not exempting subactivities producing marketable commodities or services used or consumed in the main business activity, each of which subactivities shall be considered business. The giving or supplying of services as an employee and the furnishing of property, services, substances, or things, by a person who does not hold himself out as regularly engaging in those transactions, does not constitute business under the meaning of this chapter.
If and when the Legislature rewrites the Business License Act, we suggest it try to streamline the first sentence of the passage we have just quoted.

They also contended that several at-cost purchases did not "benefit" the corporation receiving the money. We held that all of the subject transactions had produced direct or indirect benefits:

> It is undeniable that each of the taxpayers was engaged in corporate activities, or was caused by a parent corporation to engage in such activities, with the object of financial gain, either for the direct benefit of the corporation or the indirect benefit of its parent corporation.

*Id.* at 275.

*Alaska Pulp* was followed by *Williams v. B.P. Alaska Exploration, Inc.,* 677 P.2d 236 (Alaska 1983). The taxpayers in *B.P. Alaska Exploration* were the "operators" of oil and gas leases on the North Slope. Other oil companies, co-holders with the taxpayers of the leases, reimbursed the taxpayers for their expenses in managing operations on the leases. B.P. Alaska claimed that the operating agreements produced no profit or benefit of any kind. In that case the Department contended that "business", as defined in AS 43.70.110(1), extends beyond "for profit" activity. It argued that a natural reading of the definition also includes all activities undertaken for financial gain or benefit, even where the possibility of actual profits is foreclosed. In *B.P. Alaska Exploration,* we agreed with the Department's position, stating:

> Given the wording of AS 43.70.110(1), and our review of relevant case law, we conclude that the hearing examiner was correct in finding that taxpayers engaged in business by virtue of their activities as operators. Most other jurisdictions have employed expansive definitions of "gain, benefit, or advantage" when taxable "business activity" has been defined in these terms.

*Id.* at 241 (footnote omitted).[6]

*B.P. Alaska Exploration* and *Alaska Pulp* lead us to reject Alyeska's claim that it was not conducting "business" as that term is defined in AS 43.70.110(1). In our view, the concept of "indirect" benefit defeats Alyeska's argument, given our reference in *Alaska Pulp* to the "indirect benefit of its parent corporation." Here Alyeska's owners chose to create a close corporation and caused it to function as the venture manager for the construction and operation of TAPS. If a parent corporation chooses to operate a subsidiary at cost—or a group of parent corporations, like Alyeska's owners, makes a similar choice—then the subsidiary's receipts are taxable under the ABLA, even though the subsidiary itself makes no profit. Here the decision to operate Alyeska at cost was made in the operating agreement which established it. The connection between the indirect benefit to Alyeska and the direct benefit to the owners, who by entering into the agreement avoided conflicts among themselves and retained control over project costs, is clear. The owners saved money and resources by structuring the operation in a manner in which they could retain control. It is clear that a subsidiary whose parent operates it at cost receives an indirect benefit through the parent's consequent economic strength. We also note that Alyeska was enabled to carry out its own active corporate functions by virtue of the reimbursements it received from the owner corporations. Thus Alyeska itself received both direct and indirect benefits from the reimbursements it received.

### III. REIMBURSEMENTS FROM ALYESKA'S OWNERS WERE "GROSS RECEIPTS" UNDER THE ABLA.

■ As we consider Alyeska's contention that the reimbursements it received were not gross receipts under AS 43.70.110(2),[7]

---

6. In holding that B.P. Alaska Exploration was engaged in business, as that term is defined in AS 43.70.110(1), we cited, *inter alia, Brady v. Getty Oil Co.,* 376 So.2d 186 (Miss.1979), *Bonnar-Vawter v. Johnson,* 157 Me. 380, 173 A.2d 141 (1961), and *Kansas City v. Standard House Improvement Co.,* 512 S.W.2d 915 (Mo.App. 1974).

7. AS 43.70.110(2) provides in pertinent part:

*Green Construction Co. v. State, Department of Revenue*, 674 P.2d 260 (Alaska 1983), is of particular significance. In *Green* each taxpayer had entered into a contract with Alyeska to supply materials to Alyeska and to assist in the construction of TAPS. Under the individual contracts Alyeska paid the taxpayers a total contract price which included reimbursable costs. The taxpayers opened "zero balance bank accounts" to receive and disburse funds for reimbursable costs. When a taxpayer incurred a reimbursable cost, it would write a check on the account and notify Alyeska. Upon approval, when necessary, Alyeska would deposit that amount of money into the account from one of its own accounts. The *Green* taxpayers did not report the reimbursements they received from Alyeska as taxable gross receipts in the returns they filed under the ABLA. On appeal, they argued that they did not "receive" the money deposited into their bank accounts. In rejecting the taxpayers' contentions we said in part:

> The zero balance bank accounts were opened in the names of the taxpayers. The taxpayers were the signators on the accounts and they controlled the account statements. Alyeska exercised no control over the accounts, just as the taxpayers had no control over the Alyeska accounts from which the funds were transferred. Furthermore, the taxpayers do not dispute the Department's assertion that if Alyeska refused to advance any particular cost, the creditor would look to the taxpayer, rather than Alyeska, for payment. Contrary to the taxpayers' contention, the funds passing through the zero balance bank accounts were not "amounts which Alyeska ... disbursed directly to third parties." The underlying arrangement remained one in which the taxpayers incurred certain obligations in the course of their business with Alyeska, for which Alyeska reimbursed them.

*Id.* at 264.

Here Alyeska contends that it did not have "dominion" over the money it spent. More particularly, Alyeska argues that each reimbursement which passed through an Alyeska account was meant to cover a specific obligation it had incurred, and that all of its obligations were explicitly incurred on its owners' behalf. Thus, Alyeska says, its "conduit" or "dominion" theory applies: for the purposes of the ABLA, it did not have a separate existence.

We conclude that *Green*, and compelling facts in this record, require rejection of Alyeska's arguments. Alyeska was an entity, distinct from each of its owners. It engaged in a vast number of business transactions with its owners and with third parties. Although a tightly controlled corporation, it was not merely the creature of its individual owners. Important decisions concerning how to spend money were made by the "Construction Committee", a group which, by a 2/3 vote, had the power to bind the individual owners to a decision. In this way Alyeska was indeed distinct from the companies which owned it and was not a mere conduit for their funds. It was Alyeska, not the individual owners, which decided how funds were to be spent and therefore, indirectly, how Alyeska was to be reimbursed.[8]

---

"Gross receipts" means receipts from sources in the state, whether in the form of money, credits, or other valuable consideration received from engaging in or conducting a business without deducting the cost of the property sold, the cost of the materials used, labor or service cost, interest paid, taxes, losses, or any other expense.... "Gross receipts" also includes all amounts paid or assigned to subcontractors. Individuals representing firms taxed under the chapter on volume of business done, working as agents on commission instead of as employees, may compute their gross receipts as equal to their gross commissions.

**8.** *Green* and *B.P. Alaska Exploration* demonstrate that the sequence of events relating to reimbursement is not crucial. In these cases, the taxpayers incurred obligations, then were reimbursed. Thus the taxpayers were not able to "spend or borrow against" money which was already earmarked to pay existing obligations. Of significance in those cases was that the taxpayers, not the company which reimbursed them, chose how to spend the money.

Given the manner in which Alyeska made decisions, *Green* is controlling.[9] Alyeska's decisions were made independently of the wishes of any single owner. No owner controlled Alyeska so completely that Alyeska functioned as a simple conduit for that owner's funds. "Dominion" over these funds was in Alyeska. We therefore conclude that the reimbursements Alyeska received were "gross receipts" under AS 43.70.110(2) of the ABLA.[10]

## IV. EXTRATERRITORIAL TAXATION.

### (a) The ABLA Authorizes Taxation of Alyeska's Gross Receipts.

■ AS 43.70.110(2) defines "gross receipts" as "receipts from sources in the state." Alyeska argues that "[f]unds channelled through a New York City bank account from the Lower 48 owner companies to Lower 48 suppliers and contractors for services performed and goods delivered in the Lower 48" do not fall within that definition. The gist of Alyeska's argument is that "[j]ust because the completed project is in Alaska does not mean that all its parts were attributable to Alaska." Alyeska seeks an apportionment of its receipts between its in-state and out-of-state operations.

The Department's response to Alyeska's statutory argument is that "the 'source' of Alyeska's revenues was its role as venture manager in the construction of TAPS. If Alyeska had not been engaged in the construction of TAPS, it would not have received any of the receipts taxed by the Department." The Department relies on *State, Department of Revenue v. Northern TV, Inc.*, 670 P.2d 367 (Alaska 1983), where the taxpayer argued that receipts from out-of-state broadcasting companies were not "from sources within the state"

under ABLA. This court rejected that argument:

The question to be decided is whether the "source" of the revenues received by Northern TV is considered to be the out-of-state entities paying for the airing of the broadcasts in Alaska or Northern TV's in-state activity of broadcasting television programs. We believe it is the latter. Taxes assessed under the Alaska Business License Act are a tax on doing business in the state. Applied here, the taxes are imposed upon the privilege of engaging in the business of transmitting television programs, not on the product (programs) themselves. It is Northern TV's control of commercial "air time" and thereby of access to audiences within the state that is the "source" of its revenues from major network distributors. Therefore, Northern TV's business activities within Alaska are taxable as gross receipts from sources in the state.

*Id.* at 371 (footnote omitted).

We think the Department's reliance on *Northern TV* is justified, and that Alyeska's reimbursement for out-of-state expenses incurred as part of the pipeline project fall within the definition of "gross receipts" in the ABLA.

### (b) The Commerce Clause Does Not Prevent Alaska From Taxing Alyeska's Gross Receipts.

■ The Department and Alyeska agree on the applicable four-part test for determining the validity of a tax under the commerce clause of the U.S. Constitution:

1) there must be a nexus between the taxed activity and the taxing state;

2) the tax must be fairly related to the benefits provided by the state;

3) the tax must be fairly apportioned between taxpayer's in-state and out-of-state activities; and

---

9. *See also Williams v. B.P. Alaska Exploration, Inc.*, 677 P.2d 236 (Alaska 1983).

10. Alyeska attempts to distinguish *Green* on the ground that a creditor of a *Green* taxpayer would have looked to the taxpayer for payment, while a creditor of Alyeska would have looked

to the owner companies. We are not sure this argument is correct on the facts and in any event find it unpersuasive. To the extent that Alyeska is arguing that it was merely the owners' agent, we note that their tight control over it undercuts this argument.

4) the tax cannot discriminate against interstate commerce.

*Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977).

Alyeska focuses its commerce clause argument on the third factor, the requirement of a fair apportionment. Alyeska points out that the design and planning stage of the TAPS project took place outside Alaska, as did the reimbursement to Alyeska for costs incurred in that stage. Arguing that the "Department [of Revenue] has refused to apportion the tax so as to distinguish between intrastate and interstate activities", Alyeska alleges a commerce clause violation.[11]

In response, the Department cites *Sjong v. State, Department of Revenue,* 622 P.2d 967, 975 (Alaska 1981):[12]

The purpose of apportionment is to ensure that only activities within the taxing state are subject to taxation. An apportionment formula is valid under the due process and commerce clauses only if, as

a tax measure, it assigns to a state income that can reasonably be said to result from activities or properties within its borders.

In *Sjong* we further recognized that the Supreme Court of the United States has been deferential in its constitutional scrutiny of "honest state efforts" to apportion income taxes. *Id.* at 976.

The recent decision in *Container Corp. of America v. Franchise Tax Board,* 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983) reflects a continuing pattern of deference. To show unfair apportionment, the taxpayer

must demonstrate that "there is no rational relationship between the income attributed to the State and the intrastate values of the enterprise" ... by proving that the income apportioned to [the taxing state] under the statute is "out of all appropriate proportions to the business transacted in that State."

—— U.S. at ——, 103 S.Ct. at 2948, 77 L.Ed.2d at 563 (citations omitted). *See also*

11. Alyeska relies primarily on three Supreme Court cases. In *J.D. Adams Mfg. Co. v. Storen,* 304 U.S. 307, 311, 58 S.Ct. 913, 915, 82 L.Ed. 1365, 1369 (1938), the Court found that an Indiana gross receipts tax that "includes in its measure, without apportionment, receipts derived from activities in interstate commerce" exposed the taxpayer to the risk of multiple taxation, and thus violated the commerce clause. Similarly, in *Gwin, White & Prince v. Henneford,* 305 U.S. 434, 59 S.Ct. 325, 83 L.Ed. 272 (1939), the Court struck down an unapportioned Washington gross receipts tax on the same ground. Finally, in *Evco v. Jones,* 409 U.S. 91, 93 S.Ct. 349, 34 L.Ed.2d 325 (1972), the Court rejected an unapportioned New Mexico gross receipts tax levied on the proceeds of out-of-state sales of tangible personal property.

We think these cases are factually inapposite. In all three cases, the tax was levelled on receipts from the out-of-state sale of tangible personalty. In *J.D. Adams* and *Gwin, White,* the Court relied specifically upon the risk of "multiple taxation" in finding a commerce clause violation. In all three cases, the tax was unapportioned. In contrast, Alyeska has been taxed on reimbursements for expenditures made in connection with the TAPS project; it has demonstrated no actual risk of multiple taxation; and the ABLA tax has been "apportioned" in the sense that the expenses of maintaining Washington and Texas offices have been excluded.

12. *Sjong* upheld the taxation of about 90% of the income of a Seattle crab fisherman who harvested his catch off the Alaska coast and then sold it to Alaska processors. The Department used 3-factor (i.e.: sales, property, and payroll) formulary apportionment to calculate the taxpayer's in-state activity. In *Sjong* this court upheld the tax against both due process and commerce clause (as well as statutory) attacks.

The Department also cites two cases where state courts upheld unapportioned gross receipt taxation by state A of companies which spent some money in state B as part of a project in state A. In *Mountain States Advertising, Inc. v. Bureau of Revenue,* 89 N.M. 331, 552 P.2d 233 (N.M.App.1976), a Colorado corporation, using Colorado materials and a Colorado crew, built advertising signs in New Mexico. When the taxpayer argued that only 10% of its costs went to sign maintenance, and that New Mexico should not tax the other 90% of its gross receipts, the court concluded that "[t]axpayer was confused with relating cost accounting with performance of a service in New Mexico." *Id.* 552 P.2d at 235. Similarly, the taxpayer in *J.C. Penney Co. v. Hardesty,* 264 S.E.2d 604 (W.Va. 1979), brought pre-fabricated structures from Pennsylvania into West Virginia for erection. The court upheld a gross receipts tax on the entire contract price, despite all the preparatory activity that took place out-of-state.

*Moorman Manufacturing Co. v. Bair*, 437 U.S. 267, 274, 98 S.Ct. 2340, 2345, 57 L.Ed.2d 197, 205 (1978). Ultimately, whether the inquiry be phrased in terms of "fair apportionment" or "rational relationship/appropriate proportions", the judgment of a tax's validity under the commerce clause requires a reasoned comparison of what a taxpayer did in the taxing jurisdiction, and how that activity was taxed. Perfection in apportionment is neither possible nor necessary. Given that the sole purpose of Alyeska's existence was to build the TAPS, and that all of Alyeska's receipts were reimbursements for expenses incurred in the planning and execution stages of that project, we hold that the taxes imposed on Alyeska by the Department did not violate the "fair apportionment" test of the commerce clause.

Alyeska also argues that the taxes levied by the Department violate the constitutional test of "internal consistency": "the [apportionment] formula must be such that, if applied by every jurisdiction, it would result in no more than all of the ... business's income being taxed." *Container Corp.*, 463 U.S. 159, ___, 103 S.Ct. 2933, 2942, 77 L.Ed.2d 545, 556. Alyeska advances a variation on this theme by arguing that if other states used the rationale of *Alaska Pulp* to construe their own gross receipts tax statutes, then Alyeska would be doubly (triply, etc.)· taxed. The Department responds that Alyeska has not carried its burden of making a definitive showing of an actual risk of multiple taxation.

■ A taxpayer need not demonstrate an actual risk of multiple taxation in order to prevail in a commerce clause attack ·on a state tax, at least where the challenged tax is discriminatory on its face. *See Armco v. Hardesty*, ── U.S. ──, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984). On the other hand, in cases like the one before us, where the taxpayer challenges the apportionment of receipts under a statute not discriminatory on its face, even a demonstrable risk of "overlapping taxation" may not prove fatal to the taxing statute. "At least in the interstate commerce context, ... the anti-discrimination principle has not in practice required much in addition to the requirement of fair apportionment." *Container Corp.*, 463 U.S. 159, ___, 103 S.Ct. 2933, 2943, 77 L.Ed.2d 545, 557. In short, the existence or likelihood of multiple taxation is relevant to, but not dispositive of, the constitutional validity of Alaska's gross receipts tax on Alyeska. It is far from clear that even if another state chose to follow *Alaska Pulp*, it would necessarily hold that Alyeska's business in that state was taxable.[13] Moreover, Alyeska has not asserted that any other state has yet attempted to tax it on any receipts previously taxed by Alaska. Since the contested taxes in this case are on receipts received in 1975 and earlier, the fact that no actual risk of multiple taxation has yet emerged indicates that Alyeska's "internal consistency" argument is more speculative than real.

■ In light of Alyeska's failure to demonstrate that another state, following our holding in *Alaska Pulp* in construing their own gross receipts tax, is likely to dupli-

---

**13.** Our holding in *Alaska Pulp* was that, on the facts of that case, the receipts from overseas sales by domestic international sales corporations (DISCs) were taxable under the ABLA. It is not clear from the record that a sufficient nexus existed between Alyeska and any other state to successfully uphold a tax of Alyeska's receipts by that state from constitutional attack. Indeed, Alyeska has emphasized the multi-state nature of its activities: its financial transactions were channelled through New York bank accounts, while contracts were signed, and goods and services obtained, elsewhere. Alyeska itself was a Delaware corporation. In short, Alyeska has failed to substantiate its claim that

If the ABLA were applied to Alyeska's bookkeeping, banking, and management activities in the states of Texas, Washington, New York and California, those states would each tax as gross receipts the advances for activities taking place in each respective state, regardless of the fact that the design and construction activities were ultimately to be incorporated into a project in Alaska.

*Alaska Pulp* would not support such a result; nor do we think that Alyeska has persuasively demonstrated its likelihood.

cate the taxes which Alaska has levied on Alyeska's receipts, we conclude that the challenged tax did not violate the "internal consistency" test of the commerce clause.

(c) *The Due Process Clause Does Not Prevent Alaska From Taxing Alyeska's Gross Receipts.*

In *Sjong* we discussed the subject of commerce clause and due process infirmities in state taxation. There we said in part:

> [C]ourts ... have usually placed considerations of minimum contacts and sufficient nexus under the due process heading, while questions regarding the proper apportionment of income to the taxing state and the discriminatory impact of taxes are covered by the Commerce Clause.

622 P.2d at 973 (citations omitted).

■ Alyeska does not develop its due process argument independently of its commerce clause argument, making only passing reference to the due process clause in its reply brief. We hold that Alyeska, in light of the protection, opportunities, and benefits Alaska provided it, has no basis for a due process challenge to the tax, under the test of "minimum contacts" outlined in *Sjong:*

> In determining what constitutes sufficient minimum contacts for the purposes of taxation, the Supreme Court has adopted the following basic test first stated in *Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267 (1940): "That test is ... whether the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state. *The simple but controlling question is whether the state has given anything for which it can ask return.*" 311 U.S. at 444, 61 S.Ct. at 250, 85 L.Ed. at 270–71 (emphasis added). As we stated in *North Slope Borough v. Puget Sound Tug & Barge,* 598 P.2d 924, 928 (Alaska 1979):
>
> > Due process requires that a tax be related "to opportunities, benefits, or

protection conferred or afforded" by the taxing authority and such a relationship exists "if the tax is fairly apportioned to the commerce [there] carried on." *Ott v. Mississippi Valley Barge Line Co.,* 336 U.S. 169, 174 [69 S.Ct. 432, 434], 93 L.Ed. 585, 589 (1949).

*Id.* at 970. There is thus no merit in Alyeska's due process argument.

AFFIRMED.